# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4822-16T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

Y.M.,

      Defendant-Appellant,

and

J.S.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.S.
and Z.H.,

      Minors.

_____

      Argued April 30, 2019 – Decided May 16, 2019

      Before Judges Yannotti and Natali.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0020-17.

Bruce P. Lee, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Bruce P. Lee, on the briefs).

Katrina A. Sansalone, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Katrina A. Sansalone, on the brief).

Meredith A. Pollock, Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, of counsel and on the brief; Sean P. Lardner, Designated Counsel, on the brief).

PER CURIAM

Y.M. (Yolanda) appeals from a June 26, 2017 Family Part order terminating her parental rights to her two children, L.S. (Lynn), and Z.H. (Zachary).[1] Lynn and Zachary's biological father is J.S. (James).[2] Having

---

[1] We use fictitious names for Y.M., L.S., Z.H., H.C., J.C., J.S., and D.C., to protect their privacy and for ease of reference.

[2] James completed an identified surrender of his paternal rights to Lynn and Zachary on October 24, 2016, and was dismissed from the litigation. He has not participated in this appeal.

considered her arguments in light of the record and applicable legal principles, we affirm.

I.

In addition to Lynn and Zachary, Yolanda is the biological mother of two other children, H.C. (Henry) and J.C. (Jennifer). Henry's biological father is J.J., and D.C. (David) is Jennifer's father.

In June 2014, the Division of Child Protection and Permanency (Division) received a referral from Zachary's school regarding suspected physical abuse by David against then-three-year-old Zachary. The school reported that Zachary had a bruise on his face which Zachary attributed to a fall caused by David striking him.

The school also alleged that Zachary had bruises on both cheeks the week prior. When asked about those bruises, Zachary initially explained that he ran into a doorknob, but then said he fell on the floor. When the school worker asked if someone grabbed him, Zachary responded "yeah, [David] grabbed me."

The school further reported that Zachary had been emotional and crying, and that Yolanda and the children had recently moved in with David. Zachary also stated that he once saw David hit Yolanda. After an investigation, the

A-4822-16T3

Division concluded that Zachary was harmed, but it did not substantiate the physical abuse allegations.

In August 2014, Yolanda obtained a temporary restraining order against David after a domestic violence incident for which she was treated at the hospital. She later dropped this restraining order and moved back in with David that same month.

Three months later, on September 23, 2014, the Division received another referral from Henry's daycare, after a daycare staff member observed bruises on Henry's side and ribs, as well as bruises and scratches on his face and back. Yolanda explained that Henry acquired the scratches because he was starting to crawl and the bruises were birth marks. The Division reviewed Henry's birth records and confirmed that some of the marks on Henry's skin were birth marks. The Division consequently found there was no physical abuse or risk of harm to Henry.

On October 8, 2014, Henry's daycare again contacted the Division to report a bruise on his forehead, which Yolanda explained was caused when Henry hit his head while in his "bouncy swing." The daycare workers also observed more bruises on Henry's right and left upper rib cage.

The Division investigator took photographs of Henry's bruises, and a physician, Dr. Marita Lind, reviewed them. Dr. Lind stated that Henry needed to be seen at Cooper University Hospital immediately for further evaluation. She also observed that Henry looked small for his age.

A Division caseworker, Perrin Rutter, asked Yolanda to meet her at Henry's school. When Yolanda arrived, she "appeared to be very upset and crying" and stated she had not seen the bruises on Henry's ribs, even though she had given him a bath the night before and dressed him that morning. The only explanation that Yolanda offered was that she had recently played "airplane" with Henry, by holding him up by his rib cage and spinning him around.

Rutter directed Yolanda to take Henry to a doctor at Cooper Hospital that day. After Yolanda initially declined, another Division caseworker advised that if Yolanda refused to take Henry to Cooper Hospital, the Division would take custody of the children.

While Yolanda prepared to take Henry to the hospital, Zachary told Rutter that he was scared of "daddy" and that his "dad" did not live with him. Zachary said he was scared of his "dad" because he "[hit] him on the buttocks with his hand," and hit Zachary's brother and sister. Zachary stated that his "dad" hit Henry on the head with his hand because Henry cries, and that his "dad" "yells

a lot," but that he never saw his "dad" hit Henry any other time. Zachary also stated he did not know how Henry's ribs were bruised. When Rutter asked about Yolanda, Zachary commented that Yolanda did not yell at Henry, never dropped him, and was "always playing and laughing with" Henry. Both Zachary and Lynn denied that they, or their siblings, were physically disciplined by Yolanda.

Henry underwent testing at Cooper Hospital, which included x-rays and blood tests. He was also examined by Dr. Kathryn McCann. Yolanda repeated to Dr. McCann her claim that Henry bruised his head when he hit it on a toy that was hanging from his "bouncy swing." Regarding the bruises on Henry's ribs, Yolanda told McCann the same thing she told the Division; that she might have caused those bruises playing airplane.

Henry's x-rays showed that he had twenty rib fractures at different stages of healing, a fracture of his right arm consistent with pulling or twisting, a jaw fracture, and a partially collapsed lung. Cooper Hospital physicians determined that Henry had suffered non-accidental trauma and also diagnosed him with numerous conditions, including failure to thrive and developmental delays. Henry weight was below the fifth percentile, but he began gaining weight after he was admitted to the hospital.

A-4822-16T3

The day following the referral, on October 9, 2014, Yolanda met with the Vineland Police Department and told them Henry broke his bones when he fell off the bed. When the officer told Yolanda that falling off the bed would not cause all of the rib fractures, she responded that she did not know how else the injuries would have occurred.

Yolanda admitted to the officers that David "smack[ed]" her and punched her in the mouth. She also said that David hit Zachary and Lynn for jumping on the bed, and that he hit the back of their legs with his leather belt several times. Yolanda "smacked [David] in the back when he hit" the children, but he just hit her back. When asked if she thought David could have hurt Henry, she cried and answered yes, asking "[h]ow could I have been so blind, my poor baby?"

With respect to the bruises on Henry's ribs, Yolanda told the police that on October 7, 2014, David gave Henry a bath and dressed him for bed, which David did regularly. The following morning, Yolanda changed Henry's diaper but did not see any bruises because she did not remove his shirt.

The Vineland police and Rutter also interviewed Lynn. Lynn told them that David broke Henry's ribs, and that David grabbed Henry and hit him because he would not drink his bottle. Lynn indicated Yolanda was present and told

David to stop. Lynn said that David hit her and Zachary in the face with a belt and their backs with a broomstick.

Lynn also said she witnessed Henry hit his head on the bouncy swing. Lynn also stated that Zachary had laid down on the floor and David hit him with a broomstick on his back until he bled. She added that Yolanda was downstairs when David hit them and that Yolanda would hit David in the back when she witnessed David striking them. Lynn also said David hit Yolanda when they were at his house.

The Division executed a Dodd removal[3] on October 10, 2014, and removed Zachary, Lynn, and Henry from Yolanda's care. It placed Lynn and Zachary with their paternal relatives, A.P. and J.P. Henry was also placed with them upon his release from the hospital on October 13, 2014.

On October 15, 2014, the court held an order to show cause hearing with respect to a Title Nine complaint, N.J.S.A. 9:6-8.33, filed by the Division against Yolanda and David. At the conclusion of the hearing, the court granted the Division custody, care, and supervision of Lynn, Zachary, and Henry, and granted Yolanda supervised visitation.

---

[3] A "Dodd removal" refers to the emergency removal of a child from a home without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

A-4822-16T3

On October 17, 2014, the Cumberland County Prosecutor's Office interviewed Yolanda. A detective asked Yolanda about Henry's injuries, and she told him that in June 2014, she was in a rush and placed Henry on the bed. She claimed he rolled off of the bed and landed on his stomach, and that his face and cheeks were red. Yolanda claimed she fed him that night and he seemed fine, but his face was swollen when he woke up the next morning. Yolanda reported that she called her "friend" David for advice and he told her to take Henry to the hospital, but she did not do so because she was afraid the hospital would call the Division.

On October 21, 2014, the Division interviewed David. The Division's report indicated David was "irate" because the Division had removed the children from his custody. David said that if someone had asked him how Henry was injured, then he could have told them. A Division caseworker requested David to share that information, but David answered that his attorney told him not to talk about the incident.

On October 24, 2014, Dr. Lind evaluated Henry for physical abuse. In a report dated April 13, 2015, she stated Henry's injuries indicated he experienced "repeated traumatic injury." Dr. Lind also evaluated Zachary and Lynn on that date and created reports based on her examinations. Although Dr. Lind

9

evaluated Zachary and Lynn separately, both children repeated statements that were similar to what they had told the Vineland police. When Dr. Lind asked each child if they knew why Henry was in the hospital and why they were speaking to her, Lynn and Zachary responded it was because David had hurt Henry. Zachary and Lynn also told Dr. Lind that David hit Zachary with a broomstick, and Zachary said he was afraid of David.

Lynn said she saw David hit Henry, and that David had told her to go back upstairs and "smacked [her] on [her] arm with the belt on the way." She indicated that Yolanda was present when this occurred and that David "wouldn't let Mommy go home." In the past, she also saw David throw Henry on the floor twice, and said that David had kicked Zachary's leg, hit his face, kicked her shoulder, and broke Yolanda's leg, which made her go to the hospital. Lynn said she did not witness David break Yolanda's leg, but that she heard it from upstairs and hid in the closet with Zachary. Lynn explained that Yolanda would "hide the baby" with Lynn and that Lynn heard a "smacking sound." Zachary similarly stated that Lynn would hide him and Henry from David in a closet and tell him to be quiet.

Dr. Lind recommended Lynn and Zachary also see a child mental health professional to determine the impact of these events and develop a treatment

10

plan. On November 5, 2014, the trial court continued custody with the Division and ordered that Lynn and Zachary receive trauma therapy. It also temporarily suspended Yolanda's visitation with her children.

On January 21, 2015, Yolanda was charged with one count of fourth-degree child abuse, cruelty, and neglect, contrary to N.J.S.A. 9:6-3. She plead guilty on or about June 25, 2015, was sentenced to one year probation, and ordered to comply with Division services.

At a compliance review hearing on August 26, 2015, the court reinstated Yolanda's weekly supervised visits with her children and directed her to undergo domestic violence counseling and parenting skills training. Both Yolanda and David told a Division caseworker that they were still in a relationship but did not indicate whether they were living together.

Starting on September 2, 2015, the Division facilitated supervised visits between Yolanda, Lynn, Zachary, and Henry. The Division also retained Community Treatment Services on October 13, 2015, who worked with Yolanda and her children for approximately eleven months to facilitate reunification.

Yolanda also met with a Services Empowering Rights of Women (SERV) liaison on September 8, 2015, and attended group workshops for domestic violence. On July 5, 2016, Yolanda attended a domestic violence program

through SERV and participated in six out of eight workshops. She completed a parenting skills program approximately one year later on September 27, 2016.

The Division referred Yolanda to Dr. Larry Seidman for a psychological evaluation, which occurred on September 17, 2015. Although Yolanda exhibited signs of anxiety and depression, Dr. Seidman did not recommend a psychiatric evaluation because of her "laissez-faire" attitude and because she would "likely be fully resistant" to such intervention. Dr. Seidman recommended that Yolanda receive therapy to "aide her in understanding that she [was] prone to choosing poor mates as companions and surrogate parents for her children, [and] that continued domestic violence [was] likely to cause [her] and her children even further distress or criminal penalty," and have serious negative effects on her children's welfare. He also recommended that Yolanda complete her domestic violence classes and participate in a parent education class. Dr. Seidman did not recommend that Yolanda have custody of the children at that time.

In the fall of 2015, police responded to domestic violence incidents involving Yolanda and David. According to an October 2015 police report, Yolanda tried to scratch David and held a small knife during an argument with him. David claimed he did not feel threatened, and declined the opportunity to

file a restraining order against Yolanda. In November 2015, police responded to a burglary at Yolanda's residence. She told officers she believed David tried to break into her home, but that she hid in the shower. She also told officers that they had not dated for about six months, but spent time together every day.

The Division also referred Yolanda to Dr. Scott Schafer for mental health counseling. In a May 2, 2016 report, Dr. Schafer sought to help her "recognize unhealthy, dangerous relationships; [i]dentify stressors, anxiety, depression[;] [a]ddress [her] problems as a child and parent;" and to address prior and current domestic violence, and child abuse or neglect. Yolanda attended fourteen sessions between March 2016 and January 2017, missed ten sessions within that same timeframe, and did not complete treatment.

On February 16, 2016, Judge Harold U. Johnson, Jr., held a fact-finding hearing with respect to the Division's Title Nine complaint against Yolanda and David. During the fact-finding proceeding, the court permitted the Division, over counsel's objection, to call Yolanda as a witness. Yolanda's counsel stated the Division should be precluded from calling Yolanda because it would "make her a witness against herself in the trial that the Division[] [was] prosecuting against her." The court overruled the objection and explained that because the

matter was a civil proceeding, the Division "ha[d] a right to call witnesses that [it] sees fit."

On May 10, 2016, the court issued an order finding that the Division proved by a preponderance of the evidence that Yolanda and David abused or neglected Henry, Lynn, and Zachary. Specifically, it concluded that Yolanda "allowed injury to [Henry] under N.J.S.A. 9:6-8.21(c)(1) and 8.21(c)(4)," and she "created substantial risk of injury to [Lynn] and [Zachary] under N.J.S.A. 9:6-8.21(c)(4)."

On May 22, 2016, Yolanda reported another domestic violence incident involving David. Yolanda claimed David kicked down the door to her apartment. A responding police officer noted damage to her front door and doorframe.

Dr. Seidman reevaluated Yolanda in August 2016. He reported that Yolanda would benefit from psychotropic, psychiatric treatment, and psychotherapy, but she "remain[ed] resistant to those interventions." Dr. Seidman further recommended that the court terminate Yolanda's parental rights and that the children be placed for adoption.

On August 2, 2016, the court accepted the Division's permanency plan for the termination of parental rights followed by adoption. Approximately one

month later, on September 13, 2016, the Division filed its guardianship complaint.

In May and June 2017, the court conducted a three-day trial on the Division's guardianship complaint.[4] At trial, the Division relied on documentary evidence, and the testimony of Daniel Melendez, who was a Division adoption specialist assigned to the case in October 2016 and the Division's document custodian. The Division also relied on the testimony of Dr. Alan Lee, who was qualified as an expert in clinical and forensic psychology, and conducted psychological and bonding evaluations of Yolanda, Lynn, Zachary, and the resource parents. Neither Yolanda nor the Law Guardian called any witness or offered any evidence.

On June 26, 2017, Judge Johnson issued a judgment and comprehensive and thorough oral opinion in which he found that the Division proved by clear and convincing evidence all four prongs of N.J.S.A. 30:4C-15.1(a). Judge Johnson also explained that his determinations from the Title Nine fact-finding proceeding "should become a part of" his Title Thirty decision. The court's

---

[4] Henry is not included in this litigation. After a paternity test confirmed J.J. is Henry's biological father, the court dismissed Henry from the Title Thirty matter, and reopened the Title Nine litigation to address his care and custody.

judgment terminated Yolanda's parental rights to Lynn and Zachary, and awarded the Division guardianship of the children. Yolanda's appeal followed.

On appeal, Yolanda argues that the Division failed to prove prongs one, three, and four of the "best interests of the child test" under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Yolanda also claims the court violated her Fifth Amendment rights against self-incrimination by forcing her to testify at her related Title Nine fact-finding proceeding. Finally, she claims it was improper for the same judge who presided over her Title Nine action to decide the instant guardianship proceeding. We disagree with each of Yolanda's arguments, and affirm substantially for the reasons set forth by Judge Johnson in his well-reasoned and thoughtful oral opinion.

## II.

As to Yolanda's first point, because all of the trial judge's findings were supported by evidence the judge found to be clear, convincing, and credible, they are entitled to our deference. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare v. Cesare, 154 N.J. 394, 413 (1998).

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). The right to have a parental

16                                                    A-4822-16T3

relationship, however, is not absolute. <u>N.J. Div. of Youth & Family Servs. v. R.G.</u>, 217 N.J. 527, 553 (2014); <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. <u>N.J. Div. of Youth & Family Servs. v. G.M.</u>, 198 N.J. 382, 397 (2009); <u>In re Guardianship of J.C.</u>, 129 N.J. 1, 10 (1992).

To effectuate these concerns, the Legislature codified the test for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

A. Prong One

Yolanda raises four arguments with respect to the court's prong one findings. She first argues that the Division failed to show by clear and convincing evidence that she harmed her children or will continue to harm them. Second, she contends the court failed to consider that she was a victim of domestic violence and lacked control and power over her relationship with David. Third, Yolanda claims the trial court erred in finding that she knew of Henry's injuries, and knew that her relationship with David would lead to harm to the children. Finally, Yolanda claims that the Division failed to present competent evidence that Lynn and Zachary were actually harmed as a result of David's abuse of Henry or by his domestic violence toward Yolanda. We disagree with all of these arguments.

As to the first prong, the court determined that Yolanda placed the children "in danger and continue[d] to place the children in danger in a way, which would place their health, safety, and welfare at risk." Further, the court stated it was not convinced that Yolanda ended her relationship with David, "as evidenced by her contact with him as recently" as May 2017 and April 2017.

18

Therefore, the court concluded, if Lynn and Zachary remained with Yolanda, then the children would continue to have contact with David. The court also found that Yolanda knew the injuries were occurring and "did nothing about it." All of these findings were supported by substantial credible evidence in the record.

Initially, we address Yolanda's argument that she was a domestic violence victim and, therefore, lacked power over her relationship with David. While we acknowledge that Yolanda was a victim of domestic violence, and are sympathetic to her situation, we cannot ignore that her relationship with David harmed the children, and placed them at serious risk of harm. As we have previously stated, "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe, and stable placement." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Further, in a guardianship matter, our Supreme Court has observed that "a mother's relationship with her child's potentially dangerous father may be an appropriate consideration if that relationship poses a clear threat to the child. A parent has the obligation to

A-4822-16T3

protect a child from harms that can be inflicted by another parent." <u>Division of Youth & Family Servs. v. F.M.</u>, 211 N.J. 420, 449 (2012) (citation omitted).[5]

Here, the record supports the trial court's decision that Lynn and Zachary's safety, health, and development will continue to be endangered by their relationship with Yolanda. Melendez testified as to the Division's interactions with Yolanda, Lynn, and Zachary, and Yolanda's and the children's participation in recommended services. This testimony, along with that of Dr. Lee, and Dr. Schafer's unrebutted reports, establish that Yolanda lacked insight as to the gravity of the situation, the seriousness of Henry's injuries, and her role in creating those risks to the children. Again, while we fully recognize and sympathize with Yolanda's situation, the record clearly and convincingly supports the trial court's conclusion that she harmed the children, and failed to eliminate the risk of harm to the children by continuing her relationship with David.

---

[5] Defendant's reliance on <u>N.J. Div. of Youth & Family Servs. v. F. H.</u>, 389 N.J. Super. 576 (App. Div. 2007) is misplaced. Unlike the child in <u>F.H.</u>, the evidence clearly and convincingly demonstrated a consistent pattern of actual abuse by David with Yolanda's acquiescence, coupled with a history of domestic violence and continued denial. Thus, reunification with Yolanda would expose Zachary and Lynn "to a high probability of being abused or neglected." <u>Id.</u> at 586. This harm satisfies <u>F.H.</u> and N.J.S.A. 30:4C-15.1(a)(1).

A-4822-16T3

We also reject Yolanda's claim that the court committed error when it concluded she should have been aware of Henry's injuries. Yolanda contends that since Henry's other daily caretakers, including a babysitter, did not notice or appreciate the scope of Henry's injuries, it is therefore reasonable to conclude that she was similarly unaware of Henry's injuries, and that David's abuse was the cause. As the Law Guardian, correctly argues, unlike Yolanda, the daycare staff and other temporary caretakers did not observe David abusing the children, and therefore, were not in the same position as Yolanda to observe and prevent those injuries.

Further, contrary to Yolanda's contention, the court's finding that Lynn and Zachary were harmed, or were placed at a risk of future harm, by witnessing David's abusive conduct, particularly toward Henry, was supported by competent evidence. As to the actual harm to Lynn and Zachary, at trial, Dr. Lee testified that "domestic violence issues in the home certainly raise concerns as to a child being exposed to physical risks . . . but also emotional risks . . . [b]ecause children who are exposed to domestic violence situations often have a remarkable difficulty trying to . . . make sense . . . psychological[ly] . . . [of]

the conflict that they witness between adults." Dr. Lee's opinion was supported by the medical reports admitted into evidence.[6]

For example, based on her examination, Dr. Lind recommended that Zachary see "a child mental health professional who can . . . provide an appropriate treatment plan for his experience of physical abuse and witness to domestic violence." Similarly, Dr. Lind stated Lynn should commence treatment with a therapist who can provide "trauma focused [cognitive behavior therapy] for her experience of physical abuse, witnessing physical abuse of her siblings[,] and witnessing domestic violence." In her report, Dr. McLaughlin indicated that Zachary and Lynn were in treatment with her and suffer from "complex trauma and post-traumatic stress as well as depressive symptoms" and noted both children were subjected to "multiple trauma at their home at the

---

[6] In light of the testimony from Dr. Lee, and Dr. Lind's and Dr. Maryann McLaughlin's reports, we find defendant's reliance on N.J. Div. of Youth and Family Servs. v. S.S., 372 N.J. Super. 13, 25 (App. Div. 2004), and N.J. Div. of Youth and Family Servs. v. I.H.C., 415 N.J. Super. 551, 583-84 (App. Div. 2010) misplaced. In S.S., we concluded that a court cannot "take judicial notice of the fact that domestic violence begets emotional distress or other psychic injury in child witnesses." 372 N.J. Super. at 25. Here, rather than taking judicial notice of the harm caused to Lynn and Zachary by witnessing domestic violence to their siblings, Dr. Lee's unrebutted testimony, along with Dr. Lind's and Dr. McLaughlin's reports, provided sufficient, competent evidence for the court to conclude the children were harmed and the Division clearly and convincingly satisfied prong one.

hands of their mother's significant other." She indicated that children like Lynn and Zachary who suffer from trauma from individuals close to them need more therapy than those who suffer from one incident. She noted that both children were cooperative but the therapy was moving slowly and could take up to thirty-six months.[7]

Finally, with respect to the risk that the children's health and safety will be endangered by their relationship with Yolanda, we note that evidence of a sibling's abuse is relevant to show harm to a child in a Title Thirty termination of parental rights proceeding. See N.J. Div. of Youth & Family Servs. v. T.U.B.,

_____

[7] Yolanda did not object to the admission of Dr. Lind's or Dr. McLaughlin's records at trial (or any of the Division's documentary evidence), nor has she claimed on appeal the admission of those records, or the court's reliance on them, was in error, or constitutes a fundamental miscarriage of justice. N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 341 (2010). Normally, the admissibility of Division reports requires satisfaction of the prerequisites for admission as a business record under N.J.R.E. 803(c)(6). M.C. III, 201 N.J. at 346-47. In M.C. III, however, the Court held that where the Division had not satisfied the N.J.R.E. 803(c)(6) prerequisites (or the "identical" requirements in N.J.S.A. 9:6-8.46(a)(3), id. at 347), solely because the appellant had expressly consented to admitting the report at trial, its admission was proper "without the necessity of the Division's compliance with the strictures of the Rules." Id. at 348. Finally, we note that, on appeal, Yolanda has not objected to the trial court's reliance on Zachary's and Lynn's disclosures, and, in fact, has affirmatively relied on certain of their statements in her merits briefs. Accordingly, we consider any argument that the court erred in considering those statements waived. See Weiss v. Cedar Park Cemetery, 240 N.J. Super. 86, 102 (App. Div. 1990).

450 N.J. Super. 210, 237 (App. Div. 2017) (stating "competent proof of the abuse or neglect of a sibling is admissible in considering harm to a child in a Title [Thirty] proceeding").

B.    Prong Three[8]

Yolanda next asserts the Division did not make reasonable efforts to provide services to correct the circumstances that led to the removal of the children.  Again, we disagree.

Here, the court concluded that the Division offered services to Yolanda and, while she participated, she did not complete the recommended services "to the point where she [could] safely in the reasonably foreseeable future have these children returned to her."  The court noted that Yolanda continued her relationship with David through regular contact.  Finally, because the children's biological father, James, completed an identified surrender of his parental rights,

---

[8]  As noted, Yolanda has not argued that the Division failed to establish prong two of N.J.S.A. 30:4C-15.1(a).  We have nevertheless independently reviewed the record and are satisfied that the Division clearly and convincingly satisfied this statutory element as well.  Indeed, there was ample support in the record for the court's finding that Yolanda's continued relationship with David showed she was unwilling to provide a safe and stable home for Lynn and Zachary and she would continue to put the children in danger as a result of "the volatile nature of their relationship."

and no other alternatives placements were suggested, the court determined there were no alternatives to termination of parental rights.

There was overwhelming evidence in the record to support the court's conclusion that Division made reasonable efforts to help Yolanda correct the circumstances that had led to her children's removal. The Division facilitated visitation with the children, referred Yolanda to parenting skills and domestic violence classes, referred her to housing authorities to assist her in finding a new apartment that was not in close proximity to David, and made referrals for therapists. Despite these services, Yolanda failed to internalize any information or benefit from the classes on parenting skills or domestic violence.

Yolanda contends that the domestic violence counseling was inadequate because the Division failed to guarantee the confidentiality of her therapy sessions with Dr. Seidman and Dr. Schafer. She claims that the purported lack of confidentiality of her therapy records caused her to deny that David injured Henry for fear that David would harm her. Yolanda's argument that David could potentially have future access to these psychological reports because he is Jennifer's father is, at best, speculative. Indeed, there was is no evidence in the record to suggest that her therapists shared documents or information regarding Yolanda with David, or intended to do so in the future.

C.    Prong Four

Yolanda also raises a number of challenges regarding the court's prong four finding.  First, she contends that the Division failed to introduce competent evidence that the resource parents wished to adopt the children, and the court should have considered the possibility of kinship legal guardianship (KLG). Second, Yolanda maintains that Dr. Lee's conclusions were not corroborated by his observations, and he inconsistently applied his methodology.  Again, we disagree.

In considering the fourth prong, and relying on the uncontroverted testimony of Dr. Lee, the court concluded that terminating Yolanda's parental rights would not do more harm than good.  It found that the resource parents could "deal with" any adverse effects of the termination, but that Yolanda would "never be able to deal with the problems that [arose] from" removing the children from the resource parent.  The record fully supports these conclusions.

As to Yolanda's first argument, Yolanda waived the issue by not objecting to the testimony at trial.  M.C. III, 201 N.J. at 341.  Moreover, as the court correctly noted in its discussion of prong three, neither the Division nor Yolanda offered any alternative placements.  Additionally, Melendez testified that he explained KLG to the resource parents, and that they preferred adoption.  Since

adoption was an option, KLG was not a defense to termination.  See N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 513 (2004) (stating "when . . . permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights").

With respect to Yolanda's argument that Dr. Lee's conclusions were not corroborated by his observations, and that he inconsistently applied his methodology, Yolanda did not present any expert witness to refute or contest Dr. Lee's methodology during trial.  Additionally, the court, who was in the best position to evaluate Dr. Lee's credibility, found his testimony and his conclusions to be "credible, believable, and uncontroverted."  See State v. Cerefice, 335 N.J. Super. 374, 383 (App. Div. 2000) ("The reviewing court must give deference to the findings of the trial judge which are substantially influenced by his or her opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.").  In sum, we have reviewed Dr. Lee's testimony and conclude Yolanda's challenges to the reliability and consistency of his opinions are without merit.

## III.

Yolanda also argues that the trial court violated her Fifth Amendment rights against self-incrimination when it permitted the Division to call her as a

27

witness at the Title Nine abuse and neglect fact-finding proceeding, and then incorporated its findings from the Title Nine proceedings in its oral decision in the guardianship matter. She additionally asserts that having the same trial judge preside over both proceedings created an appearance of judicial bias that requires reversal. We conclude that Yolanda's arguments are entirely without merit.

In order to address Yolanda's Fifth Amendment challenge, we discuss some basic principles underlying that constitutional and common law principle, and its relevance in Title Nine and Title Thirty proceedings. Our Supreme Court recently reaffirmed that "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. S.S., 229 N.J. 360, 381 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). Both N.J.S.A. 2A:84A-19 and N.J.R.E. 503 contain identical language that provides "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty . . . ."

When determining whether a matter is incriminating, the court must consider "whether a criminal prosecution is to be apprehended, other matters in

evidence, or disclosed in argument, the implications of the question, the setting in which it is asked, the applicable statute of limitations[,] and all other factors . . . ." N.J.R.E. 502. Moreover, "[t]he right against self-incrimination is 'confined to instances where the witness has reasonable cause to apprehend danger from a direct answer.'" N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 266 (App. Div. 2018) (quoting Hoffman v. United States, 341 U.S. 479, 486 (1951)). As such, the court "must determine that the individual seeking to invoke the protection of the Fifth Amendment is 'confronted by substantial and real, and not merely trifling or imaginary, hazards of incrimination.'" Ibid. (quoting United States v. Apfelbaum, 445 U.S. 115, 128 (1980)).

We acknowledge that our Supreme Court has identified termination of parental rights actions as quasi-criminal matters. See In re Guardianship of G.S., 137 N.J. 168, 177 (1994); In re Guardianship of Dotson, 72 N.J. 112, 118 (1976) (recognizing that while a termination case "is denominated as a civil matter, it is almost quasi-criminal in nature, since it seeks to terminate for cause all parental ties between the children here involved and their natural parents"). Further, in certain circumstances, particularly where a defendant's criminal case was pending when she testified during a Title Nine fact-finding hearing, we have

concluded that a defendant's Fifth Amendment rights could be impacted. See S.K., 456 N.J. Super. at 271 (holding that "[b]ased on the related criminal charges pending against him at the time, defendant had a well-founded basis to believe that answering the [Deputy Attorney General's] questions [at the fact-finding hearing] would violate his right against self-incrimination under the Fifth Amendment and N.J.R.E. 503").

However, we have also stated that "[a]n action for termination of parental rights is a civil action." N.J. Div. of Youth & Family Servs. v. M.Y.J.P., 360 N.J. Super. 426, 467 (App. Div. 2003). Thus, although termination of parental right cases are recognized as "quasi criminal," and require additional protections, there is no case law to support defendant's claim that Title Thirty proceedings are equal to criminal proceedings in the context of the right against self-incrimination.

Applying the aforementioned principles to the facts before us, we conclude that the court did not violate Yolanda's Fifth Amendment rights. First, as noted, despite the "quasi-criminal" nature of Title Thirty proceedings, those actions, as well as Title Nine matters, remain civil proceedings, and the full panoply of rights afforded to a criminal defendant do not apply. See State v. P.Z., 152 N.J. 86, 111-12 (1997). Second, unlike the defendant in S.K., at the

time defendant testified at the May 2016 Title Nine fact-finding proceeding, she had already plead guilty to fourth-degree child abuse by neglect over a year earlier. Third, when she testified, the court had not even approved a permanency plan of termination of parental rights, nor had the Division filed its guardianship complaint. Under these circumstances, we cannot conclude that defendant had "'reasonable cause to apprehend danger from a direct answer.'" S.K., 456 N.J. Super. at 265 (quoting Hoffman, 341 U.S. at 486), such that her Fifth Amendment rights were violated when she testified at the Title Nine fact-finding proceeding. Moreover, as we have discussed, the evidence presented in the guardianship trial clearly and convincingly satisfied N.J.S.A. 30:4C-15.1(a), independent of the court's findings in the Title Nine matter.

Finally, we find defendant's claim that "an appearance of judicial bias" existed caused by the same judge presiding over the Title Nine and Title Thirty proceedings of insufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(1)(E). From our review of the record, we conclude Judge Johnson conscientiously and thoroughly considered all of the competent evidence, and conducted the proceedings in a fair and unbiased manner.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4822-16T3