855 A.2d 8 (2004)
372 N.J.Super. 13
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
S.S., Defendant-Appellant, and
F.S., Defendant.
In the Matter of S.S., a Minor.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 2004.
Decided July 1, 2004.
*9 Michael R. Ascher, Denville, argued the cause for appellant (Einhorn, Harris, Ascher, Barbarito, Frost & Ironson, attorneys; Mr. Ascher, on the brief).
Geraldine O. Livengood, Deputy Attorney General, argued the cause for respondent, New Jersey Division of Youth and Family Services (Peter C. Harvey, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Livengood, on the brief).
Yvonne A. DeCicco, Assistant Deputy Public Defender, argued the cause for the minor S.S. (Yvonne Smith Segars, Public Defender, Law Guardian for S.S.; Ms. DeCicco, on the brief).
Before Judges STERN, LEFELT and PAYNE.
The opinion of the court was delivered by
PAYNE, J.A.D.
S.S., the wife of F.S. and the mother of a twenty-one month old infant boy, appeals from a determination on October 8, 2002 by the family court following a fact-finding hearing, memorialized in an order dated October 31, 2002, that she abused or neglected her infant son by failing to appreciate the continuing risk of harm posed by the actions of her husband, see N.J.S.A. 9:6-8.21c(4)(b), thereby requiring the assistance of the court. At issue is whether, under the facts of this case, a battered wife can be found to have abused her infant son because the son was present and at times in her arms, unharmed, when his mother was physically attacked by his father and because, after the attack, the wife initially sought to remain in the violent relationship.
The facts are as follows: On August 8, 2002, a dispute arose between appellant *10 and her husband after he came home from work in the late afternoon to find his wife at the next-door-neighbor's house briefly minding the neighbor's children and his dinner unprepared. Following appellant's return to the home, words were exchanged, and appellant went onto the deck with her son. As the son played with his toys on the deck, appellant's husband placed his hands around appellant's neck, but, according to appellant's testimony at the fact-finding hearing, did not choke her. Appellant picked up her son and left in her car.
After approximately twenty minutes to half an hour, appellant, believing that her husband's anger had cooled, returned to the house with her son, placed him in his high chair in the kitchen, and proceeded to feed him his dinner. Verbal abuse ensued, and appellant sought to leave the kitchen with her son in her arms. While she was doing so, her husband again put his hands around her neck. Appellant retreated to her son's bedroom, placing her son on the floor, closing the door and leaning against it. Appellant's husband nonetheless entered the room, and while the son was nearby, the husband violently choked appellant and pulled her hair.
Appellant sought to call the police and, finding the phone disconnected, utilized her cell phone for that purpose as she ran from the home with her son in her arms. While appellant was outside, kneeling down with her son at her side, her husband punched her in the back of the head and attempted to flee the scene. His escape was blocked by the police, who placed him in a police car. While there, the husband threatened to kill his wife and stated to the police that he usually followed through on his threats.[1]
The husband was charged that night with terroristic threats, endangering the welfare of a child, simple assault, and criminal coercion. Bail was set by a municipal court judge at $100,000 with no ten-percent option, and a no-contact order was entered with respect to the child. According to the police report, appellant declined a restraining order. Because he could not make bail, the husband was taken to the Morris County Correctional Facility.
On August 12, 2002, the husband's bail was reduced by a Superior Court judge to $10,000 with no ten-percent cash option, and the no-contact order was extended to cover appellant. The husband made bail on that day, and went to his mother's house to stay. He was eventually admitted to the pretrial intervention (PTI) program. No contact with appellant was made a condition of PTI.
On August 13, five days after the event, the local police referred the matter to the Division of Youth and Family Services (DYFS) pursuant to N.J.S.A. 9:6-8.10, and an investigation was commenced. N.J.S.A. 9:6-8.11. A DYFS case worker *11 contacted appellant by telephone, and made an appointment to see her the next day. A home visit followed on August 14, at which time the home was reported as "clean, neat and appropriately furnished." The child was described as "a friendly, happy, healthy looking 2 year old." After hearing appellant's version of the events, including a prior event of domestic violence occurring three years earlier, the case worker suggested that appellant obtain a restraining order. The case worker stated that she refused, a statement that appellant contested at the fact-finding hearing. The case worker's notes then indicated that she told appellant that she needed "to cooperate and enter treatment at JBWS [Jersey Battered Women's Service]." In response to a call by the case worker to the pediatric group caring for appellant's child, his pediatrician stated that the group had "no concerns" about the child's care. The "[m]other is always appropriate, concerned. She is very careful with him and comes in with a list of questions."
On August 16, the case worker mentioned serious concerns about the safety of the child to the husband's criminal attorney, and warned him that if there were another incident, the child might be removed from the home. On that day, the case worker also learned indirectly that at some point, appellant had made a call to the prosecutor's office and had left a message in which she sought to determine whether her husband's bail could be reduced so that he could return home for the weekend.[2] Despite the fact that appellant's inquiry was causally unrelated to her husband's release on bail on August 12, and despite the fact that restraining orders were in place and the husband had not returned home, the case worker determined that emergent ex parte removal of the child from the home was required. N.J.S.A. 9:6-8.29a.
The case worker, accompanied by the police, arrived unannounced at appellant's home while she and her son were napping. Upon awakening, appellant was both alarmed and frightened by the prospect that her child would be taken, and she questioned the case worker's right to do so, stating that she was not the law, but merely a "lowly social worker." However, upon threat that the child would be placed in foster care, appellant eventually agreed to a "voluntary" fifteen-day placement of her son with her parents. During that process, appellant was read the wrong form by the case worker, and when the correct waiver form was found, she was not informed of its content and was not given a copy.
Appellant was permitted to live with her parents, as well. However, she was not allowed to have unsupervised contact with her child, even in the parents' home. Thus, at the time of the child's removal, appellant was not permitted to transport her son to her parents, occasioning her to tell the case worker that she hoped he would cry the entire way. She also initially balked at providing milk or cookies for her son (which the case worker had not found necessary to supply herself, although she had planned to take the child), but she soon relented. The case worker appears to have been deeply offended by appellant's rash, but certainly understandable words and conduct at the time of the removal, and both were re-told at length in the complaint for protective services filed by DYFS on August 30, 2002 (see N.J.S.A. *12 9:6-8.33a; R. 5:12-1(a)) and at the fact-finding hearing.
The child was taken by DYFS to an Urgent Care center for a physical examination that disclosed no injuries of any nature and no signs of abuse. He was later driven to the grandparents' home, where appellant again voiced objections to the removal procedure and sought to obstruct it. On August 20, neglect by appellant was declared by the case worker to have been substantiated, and the case was opened for supervision. Along with other relief, temporary custody of appellant's son was awarded to DYFS by the court on September 3, 2002, and the Public Defender's Office was ordered to assign a law guardian to him. On that date, appellant commenced individual therapy two times per week with Dennis J. Shanning, Ph.D. as well as weekly attendance at the Jersey Battered Women's Service. Appellant sought and obtained a final restraining order against her husband on September 30, 2002 barring contact by him with appellant, their child, and appellant's parents. She testified that she obtained a temporary order approximately one week before the final order was entered.
A fact-finding hearing in the matter was conducted pursuant to N.J.S.A. 9:6-8.47 on September 30, October 7 and October 8, 2002, at which time testimony was given by the case worker, another DYFS employee with greater actual knowledge regarding appellant's telephone message to the prosecutor regarding bail, appellant, her neighbor, her father, and her husband. At the hearing, the case worker confirmed that no signs of abuse had been found on the infant, and that the child was "a cute little guy" who was "friendly, happy and healthy." She found no indicia of emotional trauma, and could not say that he had been emotionally harmed. She stated further that when she came to remove the child on August 16, she was aware that appellant's husband had been released from custody on August 12, and that a no-contact provision conditioned his bail. She also had learned and had no reason to doubt that appellant's husband was living with his mother, although she had never sought to verify that fact. The husband was not present in the home when she arrived, and she saw no indication that he had been there previously.
The testimony of appellant's neighbor confirmed that appellant was a good mother, and indeed, no testimony to the contrary was offered during the course of the hearing with respect to any of appellant's daily interactions with her child. The neighbor further confirmed testimony by appellant that the case worker had been overbearing in her approach when she came to remove the child, and that the prospect of foster care had been utilized to coerce appellant to agree to a voluntary placement of the child with her parents. According to appellant's father, similar coercive tactics had been used by the case worker at his house. In a curious bit of testimony, appellant's husband testified that he never had, and never would injure his son. He chose choking as a means of assaulting his wife, he testified, specifically so that his child would not be physically injured.
Significantly, reports by appellant's psychologist, Dr. Shanning, dated September 19 and October 3, 2002, were introduced that indicated that appellant had experienced an "impressive" change in attitude, now recognized that she was a battered wife, and recognized further that it would not be in her best interests or those of her son to return to her husband. However, an October 3 Child Placement Review Board recommendation to the judge that placement outside the home be continued on a temporary basis was supported by the *13 statement, apparently based upon the incidents occurring between August 8 and 16 and on the appearances of appellant and her father before the Board on September 6, that: "Neither parents, nor material grandfather appears to understand the emotional harm that domestic violence has, and will have on their son."
At the conclusion of the hearing, the family court judge ruled, pursuant to N.J.S.A. 9:6-8.50, that appellant's conduct commencing on August 8, 2002 constituted abuse of her child under N.J.S.A. 9:6-8.21c(4)(b), which provides:
"Abused or neglected child" means ... (4) ... a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent ... to exercise a minimum degree of care ... (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof ... or by any other acts of a similarly serious nature requiring the aid of the court.
Thus, the court sustained the complaint filed by DYFS and held that an exercise of its jurisdiction was required. Although the judge continued physical custody of appellant's child with her parents, he removed the requirement of supervised contact, finding that he was "a little perplexed" why the requirement remained.
Litigation as to appellant was dismissed by court order dated August 12, 2003, and thus her custody of the child was restored without condition. However, as a consequence of the determination by DYFS that abuse by appellant was substantiated and the court's finding of abuse, appellant's name was entered and retained in the Central Registry of substantiated child abusers maintained by DYFS. N.J.S.A. 9:6-8.11.
On appeal, appellant argues that (1) the finding of jurisdiction by the court was erroneously based upon statements regarding appellant's request for reduction in bail that constituted double and triple hearsay; (2) insufficient credible evidence existed in the record to support jurisdiction; and (3) the court abused its discretion by speculating upon the effect of appellant's decision not to seek a temporary restraining order.
We focus on the appellant's claim that the judge's determination at the close of the fact-finding hearing that she was an abusive parent lacked evidential support. In this regard, the judge found as a matter of fact that appellant had been holding her son when she was attacked. Nonetheless, he made no finding of actual or potential physical harm to the child but, like the Child Placement Review Board, focused on actual or potential harm to the mental or emotional condition of the child resulting from observing the abuse. In this regard, the judge stated:
Domestic violence in the presence of a child has long been held to negatively impact upon a child. It's been the basis for the Superior Court exercising jurisdiction throughout the state and although [the mother] here was not the aggressor or the batterer, and in my view she's clearly a victim, she certainly put the child at risk by returning to [the father] and exerting efforts to have him return home.
* * *
I agree here with the C.P.R. Board where it finds that neither the parents nor the maternal grandparents appear to understand the emotional harm that domestic violence has and will have on a child, in this case the son.
Our concern with the court's rationale lies in the fact that emotional harm to the child as the result of witnessing domestic abuse was assumed by the DYFS *14 case worker, the C.P.R. Board and by the fact-finding judge.[3] Yet, there is absolutely no evidence in the record to support that assumption or the further assumption that by initially refusing proffered advice to obtain a restraining order and seeking a reduction in her husband's bail, appellant necessarily emotionally endangered her child. No witness stated as a matter of fact that evidence of emotional injury to the child appeared, either as demonstrated by changes in the child's willingness to socialize, or observations of excessive crying, aggression or passivity, clinging, separation anxiety, sleep disturbances or any other change in the child's behavior that could be associated, in a non-verbal infant, with stress, distress or emotional difficulty. All evidence indicates that the child remained a happy, healthy, emotionally secure twenty-one-month-old baby. Further, no psychological evidence was introduced to support, even as a general matter, a causal relationship between witnessing domestic violence and emotional distress in the young, and no expert sought to balance any harm found to exist as the result of domestic violence with evidence of emotional harm arising as the result of the removal so as to permit an assessment of whether removal served the best interests of the child.[4] We find these evidential gaps to have been fatal to the underpinnings of the court's conclusion that appellant abused her child. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495, 500-01 (1974); Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753, 758 (1965).
In reaching this conclusion, we do not suggest that DYFS lacked reasonable cause to believe that appellant's child might be abused or neglected (N.J.A.C. 10:129A-2.1(a)) or even that it lacked a basis for its preliminary finding that abuse was substantiated. Nor do we question the substance of its response thereafter. We do suggest that a showing of empathy by the case worker for appellant and the utilization by her of techniques that would have diffused the confrontation between the two and would have clearly articulated DYFS' aims would have more readily and painlessly achieved the goal that the case worker sought to attain of protecting the child by breaking the cycle of abuse directed toward his mother. See e.g. N.J.S.A. 9:6-8.35b (DYFS may, "with the safety of the child of paramount concern ... [a]ttempt to adjust suitable cases before a complaint is filed over which the court apparently would have jurisdiction."). Nonetheless, we cannot say in a situation in which a potential for abuse was present that DYFS erred by exercising caution on the child's behalf. Its duties in this respect are paramount. N.J.S.A. 30:4C-1.
Moreover, we recognize that for DYFS to offer the services that it does to battered spouses, including services designed to break the cycle of abuse, it must first assert jurisdiction over the spouse and establish grounds for doing so. However, we view the fact-finding process that, pursuant to statute, must be undertaken by the family court as a significant and necessary check on the actions of DYFS in this respect. We concur with the family court judge that, in general, the focus of such fact-finding must remain upon the *15 situation that existed at the time that DYFS acted. However, we find that such focus must rest individually on the violent and on the battered parent, and must be informed by the testimony and other evidence regarding the situation that is adduced at the fact-finding hearing. Further, the focus must center upon the question of whether the parent under consideration caused injury to the child and, if not, whether that parent is likely to do so in the future. We see no reason, when judging the likelihood of future harm, that the court focus solely on events at the time of the removal if causes for concern have been significantly alleviated.
We recognize that non-intentional conduct is sufficient to warrant a finding of abuse if injury to the child is demonstrated. G.S. v. Department of Human Serv's, Div. of Youth and Family Serv's, 157 N.J. 161, 175-82, 723 A.2d 612, 619-23 (1999)(holding that conduct causing unintended injuries can form the basis for a finding of child abuse, and that absence of a minimum degree of care can be found when the guardian is aware of dangers to a child inherent in a situation, yet acts in reckless disregard for those dangers). We also recognize that the court "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of DMH, 161 N.J. 365, 383, 736 A.2d 1261, 1270 (1999). However, as a part of its burden of proof, the State must still demonstrate by a preponderance of the competent, material and relevant evidence (N.J.S.A. 9:6-8.46b) the probability of present or future harm.
This is not a case in which conclusions drawn from facts contained in DYFS staff reports constitute prima facie evidence subject to rebuttal. See R. 5:12-4(d). And the burden has not otherwise shifted to appellant to rebut a prima facie case of abuse. New Jersey Div. of Youth and Family Serv's v. S.S., 275 N.J.Super. 173, 178, 645 A.2d 1213, 1216 (App.Div.1994); In re D.T., 229 N.J.Super. 509, 515-18, 552 A.2d 189, 191-93 (App.Div.1988). This is so because DYFS never met its initial burden of demonstrating harm to this particular child, as contrasted to harm to appellant, arising from the domestic violence that had occurred.
If we could take judicial notice of the fact that domestic violence begets emotional distress or other psychic injury in child witnesses, we would be less concerned by the court's conclusion here that appellant was an abuser. However, we cannot. The Legislature, in enacting the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, found a "positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence." N.J.S.A. 2C:25-18. However, a legislative declaration serves as an aid in the construction and implementation of a statute. Brennan v. Orban, 145 N.J. 282, 678 A.2d 667 (1996) (utilizing N.J.S.A. 2C:25-18 to support a finding of ancillary jurisdiction in the family court over marital torts); State v. Saavedra, 276 N.J.Super. 289, 647 A.2d 1348 (App.Div.1994) (utilizing findings in weapons confiscation context). It does not and can not constitutionally be held to substitute for the fact-finding of the family court. See Norman J. Singer, 1A Sutherland Statutory Construction § 20:3 at 125 (6th ed. 2002). Moreover, the legislative declaration, providing guidance to the interpretation of an act that protects battered spouses, cannot necessarily be read as affording support to the concept that the victim of domestic violence is the cause of harm in the present context.
At present, significant litigation challenges the notion that witnessing domestic violence causes permanent emotional harm *16 in the young. See, In re Nicholson, 181 F.Supp.2d 182 (E.D.N.Y.), op. supp. sub nom. Nicholson v. Williams, 203 F.Supp.2d 153 (E.D.N.Y.2002) (finding, in class action asserting claims under 42 U.S.C.A. § 1983 by battered women whose bystander children had been removed from their custody, that violations of the women's and their children's procedural and substantive due process rights and violation of the children's fourth amendment rights had taken place), on appeal sub nom. Nicholson v. Scoppetta, 344 F.3d 154 (2d Cir.2003) (certifying to the New York Court of Appeals questions of state law essential to consideration of the constitutional issues recognized by the District Court), certified questions accepted, 1 N.Y.3d 538, 775 N.Y.S.2d 233, 807 N.E.2d 283 (2003).
In District Court Judge Jack Weinstein's decision underlying his finding of constitutional violations, Judge Weinstein summarized evidence of a wide divergence among experts as to the effects of domestic violence on children (203 F.Supp.2d at 197-98), and concluded that "the children can bebut are not necessarilynegatively affected by witnessing domestic violence." Id. at 197. See also, e.g., Evan Stark, The Battered Mother in the Child Protective Service Caseload: Developing an Appropriate Response, 23 Women's Rts. L. Rep., 107, 116 (Spring 2002); Melissa A. Trepiccione, At the Crossroads of Law and Social Science: Is Charging a Battered Mother with Failure to Protect Her Child an Acceptable Solution When Her Child Witnesses Domestic Violence, 69 Fordham L. Rev. 1487, 1501-05 (March 2001); Maureen K. Collins, Nicholson v. Williams: Who is Failing to Protect Whom? Collaborating the Agendas of Child Welfare Agencies and Domestic Violence Services to Better Protect and Support Battered Mothers and Their Children, 38 New Eng. L. Rev. 725, 745-47 (Spring 2004).
We thus cannot assume (as did DYFS and the family court judge) that the present case was one in which witnessing domestic abuse had a present or potential negative effect on the child sufficient to warrant a finding of abuse against appellant the battered victim. The assumption is particularly troubling in light of its substantial potential effect upon appellant's reputation and to her employment prospects. Most significantly, the finding, initially reported by DYFS to its Central Registry of "substantiated" abusers pursuant to N.J.S.A. 9:6-8.11, will remain.
Permissible disclosure of names contained in the Central Registry, although by no means unlimited, is certainly extensive. See N.J.S.A. 9:6-8.10a (listing persons and entities entitled to disclosure and circumstances in which disclosure can occur). Inclusion in the Registry also limits, for instance, employment as a day care worker and in other education-related jobs, service as a foster parent, and the ability to adopt. See In the Matter of Allegations of Sexual Abuse at East Park High School, 314 N.J.Super. 149, 163, 714 A.2d 339, 346 (App.Div.1998) ("The Central Registry revelations not only injure [appellant's] good name but are inextricably intertwined with her capacity to obtain employment in a vast array of education-related jobs."). See also New Jersey Division of Youth and Family Serv's v. M.R., 314 N.J.Super. 390, 399-402, 715 A.2d 308, 312-14 (App.Div.1998) (detailing effects of inclusion in Registry).
Justice Long, while a member of this court, found that a teacher had an interest sufficient to warrant protection under the due process clause in obtaining a fair adjudication of whether her name should be included in the Registry. East Park, supra, 314 N.J.Super. at 159-66, 714 A.2d at 344-48. This was so, in part, because of the significant loss of job opportunity occasioned *17 by inclusion in the Registry, including the inability to serve as a child care worker. As she stated there when determining whether due process had been denied:
[I]t is without question that the government has a significant interest in keeping child abusers out of the ranks of child care workers. In re Allegations of Physical Abuse at Blackacre Academy, 304 N.J.Super. 168, 185, 698 A.2d 1275[, 1284] (App.Div.1997). However, it has or should have an equal interest in not stigmatizing the innocent and foreclosing them from employment and other opportunities.
[East Park, supra, 314 N.J.Super. at 165, 714 A.2d at 347-48.]
We note as well that, in the circumstances of this case, it makes little practical sense to include appellant's name in the Central Registry. There is no evidence whatsoever that she is a danger to children in general. Indeed, evidence suggests that she is well suited to the child care that has been central to her life. We assume that such is the case with most or all battered women whose names are included in the Registry because their children witnessed domestic violence the recurrence of which the women were physically, economically or psychologically incapable of preventing, and we question why such women should ever be included therein. Indeed, the potential for inclusion in the Registry may serve as a disincentive to mothers who would otherwise report instances of domestic violence to the police. Cf. Nicholson, supra, 344 F.3d at 174 (discussing testimony that plaintiffs would not report domestic violence against them because of fear that their children would be removed). As we have stated previously, inclusion of plaintiff's name in the Registry because of injury to her own child in the past has no support at all, nor is there any support for a claim that future injury through her actions will occur.
In conclusion, we find in this case that harm cannot be presumed in the absence of evidence of its existence or potential. Stanley v. Illinois, 405 U.S. 645, 656-58, 92 S.Ct. 1208, 1215-16, 31 L.Ed.2d 551, 562-62 (1972). Because that is what occurred, we reverse.
As the result of our determination of appellant's second issue, we do not reach the remaining issues raised in her appeal.
Reversed. The report to the DYFS Central Registry shall be withdrawn.
NOTES
[1] The police report describes the incident as follows:

She came home and he began yelling at her that she was not home when he came home and that she ignored him when he was calling for her. She left and came back a few minutes later when he hit her in the back of the head, grabbed her by the neck and tried to strangle her. As he was doing this [S.S.] was holding [their son] in her arms. [S.S.] was able to call the police and we arrived on the scene.
The threat to appellant was reported as "I'm going to fucking kill you."
The Division of Youth and Family Services case worker who spoke to appellant on August 14 reported in her case notes that appellant had stated that she had the child in her arms during the repeated attempted strangulations. However, in testimony at the fact-finding hearing, the case worker stated merely that the child had been in appellant's arms on at least one occasion when she was attacked.
[2] That appellant was required, by law, to be advised of her husband's release from custody on August 12 (N.J.S.A. 2C:25-26.1) suggests that information regarding the call was quite stale.
[3] We note that the child's former law guardian had not visited the child at the time of the fact-finding hearing, and thus lacked any basis for a view premised on observation as to the child's emotional condition.
[4] In this particular case, appellant testified that she had been unable to bond effectively with her son while under constant supervision, and that the child had suffered as the result of a lack of playmates, familiar surroundings, and accustomed activities and social interactions.