# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3431-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

P.D.,

      Defendant-Appellant,

and

S.I. and R.L.,

      Defendants.

_____

IN THE MATTER OF A.I., A.D.,
and AD.D.,

      Minors.

_____

Submitted May 8, 2019 – Decided June 18, 2019

Before Judges Koblitz and Currier.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FN-02-0290-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Marina Ginzburg, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (David Gary Futterman, Deputy Attorney General, on the brief).

Joseph Krakora, Public Defender, attorney for minor A.I. (Melissa R. Vance, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant P.D.[1] appeals from the February 1, 2018 fact-finding determination that he abused or neglected a now-fifteen-year-old learning-disabled child, A.I. (Andrea), because she suffered harm as a result of being exposed to domestic violence perpetrated by defendant throughout his tumultuous ten-year relationship with her mother. The order requires defendant, who is schizophrenic and currently incarcerated, to attend psychiatric and substance abuse evaluations before applying to the court for supervised visitation upon his release from prison, which was anticipated to be

---

[1] We use initials and pseudonyms to identify the parties to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

A-3431-17T3

approximately two years from the date the order was issued. After reviewing the record in light of the contentions advanced on appeal, we affirm.

## I. Background

The Division records, which were admitted into evidence at the fact-finding hearing, reveal the following information. In October 2014, the Division of Child Protection and Permanency (Division) received a referral from Andrea's school. Ten-year-old Andrea, who is not defendant's child, stated that when she entered her mother and defendant's bedroom after hearing her mother cry, defendant pushed Andrea into the bathroom, causing her to hit her forehead against the wall. Andrea said she also hit the back of her head on the shower. She said her younger brothers were asleep at first and then awoke "due to the yelling."

The Division worker interviewed Andrea's mother, S.I. (Susan), who denied seeing defendant push Andrea. She said that she and defendant often argued after the children went to bed.

The Division worker also spoke with defendant's two younger children, both boys. They said their parents fought "a lot." They were usually in their bedroom when their parents fought. Their mother was "hurt all the time" and cried a lot after the fights. After denying that domestic violence services were

A-3431-17T3

necessary, defendant agreed to comply with services as long as they did not conflict with his work schedule.

In early December 2014, Susan informed the Division worker she wanted defendant to leave the home but did not want police involvement. On December 9, 2014, Susan left a voice message with the Division stating she had asked defendant to leave the home, but he refused to return his keys. Susan asked the Division for assistance in changing the locks.

Two days later, Susan described an incident that occurred on the previous evening, when defendant fought with Susan's brother and she called the police. Although defendant ran off when the police arrived, he was later located and hospitalized at the Bergen Regional Medical Center (BRMC).

On December 15, 2014, after the Division could not reach Susan, a Division worker contacted Susan's cousin, who informed the worker defendant "tried to kill" Susan on the night he was hospitalized by putting his hands around her neck. That same day, defendant was released from the BRMC.

On December 16, 2014, the Division worker met with Susan at her home. The worker implemented a safety protection plan restraining defendant from the home and providing him with supervised contact with the children at the Division office.

A-3431-17T3

On December 22, 2014, police responded to the family home due to a domestic violence report. Susan told police defendant "shoved her several times while holding a screwdriver and threatening to kill her." Police arrested defendant for assault, threatening to kill, and transporting property derived from a crime, and defendant was incarcerated at the Bergen County Jail (BCJ). Defendant's history included three temporary restraining orders (TROs) against him and a 2011 charge for aggravated assault with a deadly weapon.

Defendant was released from jail on December 30, 2014. On January 9, 2015, police were called to Susan's home due to a domestic violence report. Susan told the police defendant entered the home through the kitchen window and began to search for Susan's paramour, whom defendant found hiding in the laundry room. Defendant grabbed "multiple knives" from the kitchen, "pushed [Susan] into a wall and struck her on the head with the handle of a meat cleaver en route to the laundry room." Susan "ran upstairs with [Andrea], and locked the door." Susan's paramour escaped the laundry room through a window and ran down the street. When defendant was unable to locate the man, he slashed the tires of Susan's car and fled. That same day, defendant was arrested and incarcerated again at the BCJ, where he was assigned to the mental health ward.

 A-3431-17T3

The child protective services case was later dismissed from litigation after defendant successfully engaged in services.

On April 3, 2017, the police reported to the Division that they went to the family home three times within two days. Defendant had "grabbed and shoved" Susan while the children were present and was charged with simple assault. Another time, defendant had discovered Susan's paramour at the home when he came to visit the children. Andrea reported that she witnessed defendant screaming and brandishing a golf club at her mother's "friend" until the friend ran away. When Susan went outside, Andrea witnessed defendant "shoving" Susan aggressively, causing her glasses to fall off. Andrea said she "was out of breath and shaking," and her younger siblings were "watching the incident from the living room window." Andrea called the police "because she was afraid for her mother." Defendant followed Susan's paramour and attempted to hit him with his car. When defendant missed the man's car, he hit another car, causing it to spin around, striking and killing a dog being walked by its owner.

Susan reported that defendant told her: "When I see you, you're dead . . . I hate you and your daughter . . . I'm going to get my boys all to myself." Susan obtained a TRO against defendant.

6

Andrea also reported an incident that had occurred two months before, when defendant became violent with Susan. Although Andrea and her siblings were in a separate room, they were able to overhear a "slap." Andrea was crying during the incident. She said no one called the police because defendant said "he was not afraid of the police." Andrea also said defendant told her "If I ever see your mother with another man in this house, I'm going to kill them both." Andrea said she felt safe with Susan, but not around defendant.

In April 2017, a Division worker visited defendant at the BRMC, where he admitted to having a golf club in his hands when Susan and the children arrived home, pushing Susan, attempting to hit Susan's male friend with his car, and later breaking into the home. Defendant referred to Andrea as a "liar" and said she had previously accused him of molesting her.

Dr. Jemour Maddux conducted psychological evaluations of the children, Susan, and defendant. Susan said that Andrea is "always afraid of what's going to happen next" because defendant "attacked me back in 2015 . . . . That was the one when he broke in through the window and he tried to kill me . . . she witnessed all of that."

Andrea told the doctor she does not like defendant and felt "worried" and not "free." She said she could not pay attention in school due to defendant's

7

behavior. Andrea described witnessing defendant push and hit her mother, and recalled that defendant attempted to run over her mother's friend with a car. Dr. Maddux observed Andrea was depressed. He opined that Andrea's "functioning and wellbeing" were impaired and she had low self-esteem. She had previously been diagnosed with attention deficit hyperactivity disorder. Dr. Maddux explained that her impairment was worsened by the "variability, unpredictability and chronicity of these familial threats to [her] health."

Dr. Maddux found defendant suffered from a psychotic disorder. He had previously been diagnosed with paranoid schizophrenia and was taking medication under the care of a Passaic County Jail mental-health clinician. Defendant's psychotic symptoms prevented him from recognizing reality. Dr. Maddux concluded defendant exhibited parenting limitations due to his tendency "to discontinue his treatment against medical advice despite these risks . . . ."

## II. Fact-Finding Testimony

On November 27, 2017, the court held a fact-finding hearing. Division worker Joseph Tobjy testified regarding the Division's involvement with Andrea's family starting in October 2014. Tobjy stated the allegations of abuse or neglect against defendant were deemed established by the Division both in

2014 and in 2017. He described his conversations with Andrea regarding witnessing defendant's violent behavior toward her mother. Andrea told him she did not feel safe with defendant.

Dr. Maddux testified regarding his evaluations of Andrea and her family members. He testified that the domestic violence caused Andrea's depression:

> [I]t is my impression that this is a child that's experienced impairment in the form of sadness, attention difficulties, feeling a sense of loss of control, a sense of powerlessness. It was my impression that this is a child who had a sense of undue obligation to protect her mother, as . . . it should be the other way around, and I reached a conclusion that these things are causally the result of [defendant's] behavior as she described it.

On February 1, 2018, Judge Gallina-Mecca rendered an oral decision finding the Division proved by a preponderance of the evidence that defendant abused or neglected Andrea under N.J.S.A. 9:6-8.21(c). The judge found Tobjy to be a credible witness because "he had no personal interest in the outcome of this matter," his "testimony was consistent with the documents admitted into evidence," and he "testified from his own personal knowledge and after a complete review of the Division's files in this matter." The judge also found Dr. Maddux to be a credible witness. She concluded:

> In his report and his testimony, Dr. Maddux was unequivocal that [Andrea] had expressed fear for

herself and her mother due to her experiences with [defendant's] domestic violence toward her mother. Consequently, [Andrea] has suffered functional impairment as described by Dr. Maddux, including her suffering attention problems, feeling differently from her peers, and her protectiveness of her mother.

In his unrefuted expert opinion, Dr. Maddox concluded that the child's behavioral and emotional difficulties were caused by her relationship with [defendant]. As such, the Division has proffered uncontroverted psychological evidence to support a causal relationship between [Andrea] witnessing domestic violence by [defendant] and emotional distress suffered by [Andrea].

The [c]ourt finds, based upon the totality of the evidence, particularly the uncontroverted expert opinion of Dr. Maddux, that [Andrea] suffered actual emotional harm as a result of being exposed to domestic violence by [defendant].

### III. Legal discussion.

Our review of family court decisions is limited. Hand v. Hand, 391 N.J. Super. 102, 111 (App. Div. 2007). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth and Family Services v. F.M., 211 N.J. 420, 448 (2012). "We will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct

an injustice."  Ibid. (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).  "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence" to support its decision.  Id. at 448-449.

Defendant argues on appeal that the Division presented insufficient credible evidence to meet its burden to demonstrate abuse or neglect.  Andrea did not testify at the hearing.  While "a child's hearsay statement may be admitted into evidence, [it] may not be the sole basis for a finding of abuse or neglect."  N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 272 (App. Div. 2018) (quoting N.J. Div. of Youth and Family Servs. v. P.W.R., 205 N.J. 17, 33 (2011)); see also N.J.S.A. 9:6-8.46(a) (establishing "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect").  However, "[i]t would be a rare case where evidence could be produced that would directly corroborate the specific allegation of abuse between the child and the perpetrator . . . ."  N.J. Div. of Youth and Family Servs. v. Z.P.R., 351 N.J. Super. 427, 435 (App. Div. 2002).  "A child's statement need only be corroborated by '[s]ome direct or circumstantial evidence beyond the child's

statement itself.'" N.J. Div. of Child Protection and Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018) (alteration in original) (quoting N.J. Div. of Child Protection and Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017)). Effective corroborative evidence includes eyewitness testimony, confessions, admissions, or medical or scientific evidence. Ibid. "[C]orroborative evidence 'need only provide support' for the child's statements and may be circumstantial." Ibid. (quoting N.B., 452 N.J. Super. at 521).

Here, the trial court's finding of abuse or neglect was based in part on Dr. Maddux's testimony that Andrea suffered emotional harm as a result of witnessing the behavior of defendant that she disclosed during her evaluation and to the Division. See id. at 160 (finding a medical report documenting signs of penetration sufficiently corroborative of a child's statements regarding sexual assault). The Division met its burden of proving abuse or neglect by sufficient, credible evidence because Andrea's statements were corroborated by Dr. Maddux and the Division caseworker. See id. at 157; see also N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 615 (App. Div. 2010) ("The evidence must demonstrate that the offered hypothesis is a rational inference" that permits the fact-finder "to arrive at a conclusion grounded in a preponderance of probabilities according to common experience.")

A-3431-17T3

"[C]hildren, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence." N.J.S.A. 2C:25-18; see also N.J. Div. Of Youth and Family Servs. v. S.S., 372 N.J. Super. 13, 25 (App. Div. 2004). Andrea was harmed by witnessing defendant's violent behavior.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION