# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1670-18T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

A.Q.,

      Defendant-Appellant,

and

J.P.,

      Defendant.

_____

IN THE MATTER OF
D.Q.-P. and S.P., Minors.

_____

      Submitted April 30, 2020 – Decided June 3, 2020

      Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FN-19-0044-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn Veasey, Deputy Public Defender, of counsel; Janet A. Allegro, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Victoria Almeida Galinski, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Olivia Belfatto Crisp, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant A.Q. (Mary)[1] appeals from the finding that she abused or neglected her children, in an action brought by plaintiff New Jersey Division of Child Protection and Permanency (Division) under N.J.S.A. 9:6-8.21 to -8.114, and N.J.S.A. 30:4C-12. For the reasons stated by Judge Michael C. Gaus in his March 26, 2018 factfinding order and written statement of reasons, we affirm. We add the following.

---

[1] We employ pseudonyms to preserve the confidentiality of the parties and their family. See N.J.S.A. 9:6-8.10a.

Mary and her partner J.P. (Tom) have two boys who were approximately nine and seven years old when the matter was decided. The older child (Harry) was sixteen months old when the Division first became involved with the family. Over the years, the Division has placed Mary in domestic violence shelters, with the children, where she has not remained. Mary has obtained final restraining orders under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, which she has subsequently dissolved. Mary agreed to maintain a separate household from Tom, and not allow him to be with the children without supervision. At various times he has nevertheless lived with her.

Harry and his younger brother George suffer from a host of behavioral difficulties. For this reason, the Division attempted to enroll the children in an early intervention program. Mary did not agree because Tom was "against it," and he had the "final word."

In May 2014, the Division assigned the family a caseworker, Hilary Shprecher, who testified at the factfinding hearing. By 2015, Shprecher had observed the children ignoring their mother, throwing food at each other, and chasing and harassing the family pets. George has punched Shprecher in the back, and when she chastised him for doing so, spit at her. In April 2016, the

children attended a day camp where the counselor reported that George had bitten him three times, and refused to listen to instructions or speak.

The Division referred the children to Dr. Elizabeth Stilwell, Psy. D., to "assess the degree to which their exposure to domestic violence and other traumas is impacting their development." Her report, entered into evidence without objection during the factfinding hearing, enumerated the tests she administered. She found the children to be "disruptive and aggressive," and noted that George kicked a worker in the shin. Harry was "hyperactive and aggressive[,] as evidenced by him running around the office, throwing toys, shouting, and fighting with his brother . . . ." Harry played aggressively with the toys in the office, climbed on the furniture, and his play themes were violent in nature.

When George arrived for the testing, he immediately overturned a large toy container and stomped on the contents. He was difficult to redirect, ran out of the room several times, left through the office front door, crawled under Stilwell's desk, and pointed a rubber band at her like a slingshot. When Mary attempted to intervene, the boys simply ignored her.

Stilwell noted that Mary, along with Tom, had no insight into the reasons the Division was involved with the family, and had difficulty putting her

children's needs before her own. She opined that the children's "[s]creaming, cursing, yelling, biting, hitting, and throwing objects [had] become [their] way of communicating with their parent(s)." Although the behavior could be attributed to various causes, including exposure to domestic violence, attention deficit hyperactivity disorder (ADHD), sensory processing issues, autism spectrum disorder, learning disabilities, and/or anxiety, Stilwell opined "that their behavioral presentation is being intensified by the verbal and physical violence that they have witnessed in their home."

On April 1, 2017, George was admitted to Goryeb Children's Hospital because he was "violent, impulsive, [and] hyperactive" at daycare. He was perceived as a threat to other children in the program, and had been expelled from other facilities because of his aggressive behavior. A child psychiatrist prescribed medication for him, and he was evaluated by a child neurologist.

Harry's neurodevelopmental evaluation was completed September 19, 2017, by Dr. Tosan Livingstone at Goryeb Children's Hospital. Livingstone diagnosed Harry with an adjustment disorder with mixed emotional features and conduct, as well as a mild speech articulation disorder. Although at the time he did not fit the criteria for ADHD, the doctor noted that Harry should be monitored for the condition. Livingstone diagnosed George with ADHD, an

adjustment disorder with mixed emotional features and conduct, an expressive language disorder, and a speech articulation disorder.

On December 5, 2017, before the factfinding hearing was scheduled to begin, Mary's attorney renewed a request for adjournment so her expert could determine whether the children's behaviors stemmed from reasons other than exposure to domestic violence. Counsel explained to the judge that the children visited Goryeb Children's Hospital on September 19, 2017, at which time George had been diagnosed with ADHD, and Harry diagnosed with an adjustment disorder. Counsel further argued that Mary needed the expert's testimony to demonstrate the deficiencies in Stilwell's evaluation, because she concluded the children were affected by domestic violence and was "not privy to this diagnosis of ADHD." The Division opposed the request for adjournment; it was not asserting that domestic violence alone caused the behavioral issues, but rather, that the domestic violence and the unstable home environment had caused the children actual harm, and exposed them to substantial risk of harm. The judge rejected the adjournment request, observing that the factfinding was originally scheduled for September 5, 2017, and the complaint was filed on November 14, 2016, some thirteen months before. He did so without prejudice, subject to renewal after Stilwell testified.

A-1670-18T1

The judge gave great weight to Stilwell's testimony. She testified the children's behavior reflected their exposure to significant domestic violence, and that the domestic violence was a separate cause of their difficulties. She gave an example: "three[-]year[-]olds don't say things like I'm going to cut your throat if they just have ADHD." Stilwell also opined that while children with ADHD can display disruptive and violent behaviors, those behaviors were rarely at the level displayed by Harry and George. She said "within a reasonable degree of psychological certainty that the children['s] . . . behavioral presentations were being exasperated by the domestic violence they had been exposed to from a young age."

Stilwell also testified that the neurological literature she reviewed indicated children exposed to chronic levels of stress, violence, or unpredictable environments have increased levels of cortisol in their brains which causes disruptions to normal personality growth. Specifically, in George and Harry's case, "[t]here is a lack of consistency[,] . . . [h]ome safety and predictability that disrupts their normal developmental trajectory," which manifests in increased aggression, violence, oppositional behavior, and hyperactivity.

Stilwell relied upon the Adverse Childhood Experiences (ACEs) study, which is one of the discipline's "larger studies," and included information

regarding the "impact of a variety of developmental traumas, stresses, incidences, and what that does to a child's development." Children might have learning difficulties due to the cortisol levels changing the structure of the children's prefrontal cortex, responsible for an individual's ability to plan and organize. This could also lead to difficulty paying attention in school, staying seated, completing their work, and sleeping. They would tend to be more hostile and aggressive, which would make forming friendships and later adult relationships difficult. Stilwell noted that Mary reported that Harry had issues with sleeping, night terrors, sleepwalking, and bedwetting.

When asked if the children's behavior could be explained by an ADHD diagnosis or adjustment disorder diagnosis, Stilwell opined that the domestic violence had been "so longstanding and pervasive[,] it's a chicken or the egg [thing]." When children are born into a "chaotic environment" and exposed to the domestic violence from a very young age, it is "very difficult to sort of tease out what is . . . what."

The judge found the significant level of domestic violence in the parents' relationship was undisputed. It was substantial, pervasive, and much of it took place in front of the children. Harry mimicked how his parents acted to the

Division caseworker, what they would say, and he described their violent conduct to Stilwell.

Despite numerous offers, Mary engaged in none of the services the Division offered. When the Division attempted to provide the children with early childhood education intervention services, the parents rejected the offer. Although Tom was the main aggressor, both parents assaulted each other, and engaged in significant arguments, in front of the children. Harry described his parents' arguments and mimicked their words to Stilwell, and claimed that Tom hit him.

As a result, the judge found the Division met its burden by a preponderance of the evidence establishing Mary had abused and neglected the children because of domestic violence in the home. The court further found the domestic violence was pervasive and the children harmed. The children's extreme behavior could not be explained merely by a diagnosis such as ADHD.

The court concluded that despite not intending to hurt the children, the parents' repeated acts of domestic violence were intentional. Mary and Tom were informed of the potential risks to their children should it continue, and did nothing to abate it.

A-1670-18T1

The judge reasoned there could not be any doubt that the parents' actions were "at a minimum in reckless disregard of the dangers to be suffered by the children arising for the levels of domestic violence and hostility that existed between the parties." The absence of a minimum degree of care and the reckless disregard for the severe consequences constituted abuse and neglect.

On appeal, Mary raises the following points of error:

> POINT I
> THE TRIAL COURT ERRED IN FINDING THAT [MARY] COMMITTED AN ACT OF ABUSE OR NEGLECT AGAINST [HARRY] AND [GEORGE]. SINCE THE STATE'S EXPERT, DR. STILWELL, DID NOT PROVIDE CREDIBLE EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDING THAT EXPOSURE TO DOMESTIC VIOLENCE RESULTED IN ACTUAL AND IMMINENT HARM TO THE CHILDREN.
>
> POINT II
> THE COURT COMMITTED PLAIN ERROR BY ALLOWING INTO EVIDENCE DR. STILWELL'S UNRELIABLE MEDICAL OPINION REGARDING THE IMPACT OF DOMESTIC VIOLENCE ON THE CHILDREN WHICH WAS OUTSIDE HER QUALIFICATIONS.
>
> POINT III
> THE COURT ERRED IN DENYING [MARY'S] REQUEST TO HAVE A PSYCHIATRIC EXPERT EVALUATE [GEORGE] AND TESTIFY TO CONTRADICT THE STATE'S CASE THAT THE EXPOSURE TO DOMESTIC VIOLENCE

10

CONSTITUTED HARM AND IMMINENT HARM TO THE CHILDREN.

POINT IV
THE TRIAL COURT'S CONCLUSION THAT [MARY'S] PARTICIPATION IN ACTS OF DOMESTIC VIOLENCE IN THE PRESENCE OF THE CHILDREN WAS BOTH INTENTIONAL AND GROSSLY NEGLIGENT IS WITHOUT ADEQUATE, SUBSTANTIAL AND CREDIBLE EVIDENCE FROM THE RECORD, AND THEREFORE WARRANTS REVERSAL.

I.

N.J.S.A. 9:6-8.21(c)(4) defines an abused and neglected child as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court. . . .

A parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." G.S. v. Dep't

11

of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 181 (1999). "'[M]inimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional," and "implies that a person has acted with reckless disregard for the safety of others." Id. at 178, 179. "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." Id. at 178. Additionally, "[w]hen a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182.

Moreover, "[w]hether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." Id. at 181-82. "In the absence of actual harm, a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm[,]" and the "proper focus is on [this] risk." N.J. Dept. of Children & Families, Div. of Youth & Family Servs v. A.L., 213 N.J. 1, 23 (2013). If the evidence "does not demonstrate actual or imminent harm, expert testimony may be helpful," and "[c]ompetent expert testimony, stipulations, or other evidence could shed light on the facts introduced." Id. at 28.

Importantly, the trial court's findings must be based "on the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof are synergistically related.  Each proven act of neglect has some effect on the [child].  One act may be "substantial" or the sum of many acts may be "substantial."'" N.J. Div. Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329-30 (App. Div. 2011) (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

When reviewing a family court decision, we generally defer to the trial court's factual findings, as it has "special jurisdiction and expertise in family matters."  Cesare v. Cesare, 154 N.J. 394, 413 (1998).  Only the trial court "has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. W.F., 434 N.J. Super. 288, 294 (App. Div. 2014) (quoting N.J. Div. Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009)).

Consequently, our review of findings of fact is limited to whether the findings are "supported by adequate, substantial [and] credible evidence." Cesare, 154 N.J. at 411-12; see also N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) ("We will not overturn a family court's factfindings unless they are so 'wide of the mark' that [the appellate court's] intervention is

necessary to correct an injustice."). We "expand [our] highly deferential scope of review when the alleged error does not involve credibility of witnesses but turns on the trial court's application of the law to the underlying facts." N.J. Div. of Child Prot. & Permanency v. K.N.S., 441 N.J. Super. 392, 397 (App. Div. 2015).

II.

In support of her argument that Stilwell's conclusions were unfounded, Mary relies upon New Jersey Division of Child Protection & Permanency v. N.B., 452 N.J. Super. 513 (App. Div. 2017), and New Jersey Division of Youth & Family Services v. S.S., 372 N.J. Super. 13, 22-23 (App. Div. 2004). She cites the cases for the proposition that exposure to domestic violence cannot be the sole basis for a finding abuse and neglect. Both cases, however, are factually distinguishable.

In N.B., we reversed a finding of abuse or neglect based on insufficiently corroborated statements of a child, as well as facts and complex diagnoses within a non-testifying psychologist's hearsay report. 452 N.J. Super. at 516. The child in N.B. observed arguments between his mother and her boyfriend and heard her make suicidal statements. Id. at 516-19, 522. The child's behavior did not, however, corroborate a finding of emotional harm because the child's

mood was "normal and appropriate[.]" Id. at 522. He denied he had appetite, sleep, or mood problems, or thoughts of self-harm. Ibid. The Division's only witness was a supervisor lacking in first-hand knowledge of the precipitating incident or the conduct, and who did not conduct the interviews. Id. at 526-27.

In S.S., we reversed the trial court's finding of abuse or neglect when domestic violence occurred as a mother held her infant child in her arms. 372 N.J. Super. at 15-16, 28. There was no evidence in the record whatsoever that the child had been emotionally harmed by witnessing the incident. Id. at 22-23.

In this case, Mary admitted the children witnessed domestic violence on multiple occasions. The reports from the experts, camp counselors, and Division staff constituted overwhelming proof that the children exhibited severe behavioral problems. Both N.B. and S.S. involved limited or only one incident as opposed to the "substantial and pervasive" incidents that have defined this family's home life.

Furthermore, contrary to Mary's contention, Stilwell's testimony, and her report, were not inadmissible net opinions. She personally observed the children, and gleaned information about them from extensive records provided for her review. Stilwell explained in detail the reasons for her conclusions both in her report and her testimony. Stilwell relied upon the ACEs study to predict

A-1670-18T1

the impact of domestic violence on the children's future development, and the research and literature to assist her in her conclusions regarding the impact the domestic violence exposure might have on the children. Although she may not have had the credentials to personally conduct the studies upon which she relied, they are relied upon by experts in her field, and were ultimately unrefuted.

N.J.R.E. 703 requires that an "expert opinion be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)). Stilwell gave the necessary whys and wherefores of her opinion. See id. at 54.

Mary further argues that Stilwell was required to apportion a percentage of causation for the children's behavior to both ADHD and specified behavioral diagnoses in contrast to domestic violence. No case requires such a numerical calculation. Stilwell acknowledged that ADHD could cause children to act disruptively, but not to threaten to cut someone's throat or kill them. Stilwell's point was not that exposure to domestic violence explained each and every behavioral issue, but that each and every behavioral problem the children might

16

have attributable to their diagnoses was exacerbated by their exposure to domestic violence, and that some of these difficulties existed independently of the diagnoses.

On appeal for the first time, Mary also argues that Stilwell's opinion regarding cortisol and its effect on the brain were beyond her expertise. We therefore employ not a harmless error, but a plain error standard to review the claim, which means we will reverse only if the error in the admission of the testimony was of such a nature as to have been clearly capable of producing an unjust result. R. 2:10-2.

Stilwell's testimony about cortisol and its effect on children's brains was not a medical opinion that needed to be offered exclusively by a neurobiologist. Although her testimony referenced brain development, that reference was not improper. Stilwell offered an opinion about the possible physical effects of the chronic stress and exposure to domestic violence might have on the brain based on literature in her field.

### III.

Mary contends that the judge's opinion discounted the effect that the domestic violence had upon her ability to exercise control and good judgment. But she failed to exercise a minimum degree of care "although 'aware of the

17

dangers inherent in a situation[,]' namely their abusive relationship . . . [she] 'recklessly create[d] a risk of serious injury' to their children by failing to protect the children from harm and failing to acknowledge and treat their disabilities." N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 586 (App. Div. 2010) (first and third alterations in original) (quoting G.S., 157 N.J. at 181).

Mary fought with Tom, knowing that her children were witnesses. She continued to place the children in jeopardy, despite being informed of the harm that resulted from her confrontations with Tom, and while disingenuously promising to limit and monitor Tom's contacts with the children. The Division offered Mary a host of alternatives, yet she continued to reject services and opportunities to protect the children from ongoing conflicts.

Mary maintained a relationship with Tom, and violated court orders by continuing to see and at times live with him with the children. Mary had options extended to her by the Division, but failed to exercise those options to the clear detriment of the children. That she may have been a victim of domestic violence does not relieve her of the responsibility over the years to protect Harry and George's "physical, mental, or emotional condition." N.J.S.A. 9:6-8.21(c)(4).

IV.

In deciding whether to grant a request for adjournment, a court weighs a number of well-established factors. See State v. Hayes, 205 N.J. 522, 538 (2011). A court is expected to engage in a "balancing process informed by intensely fact-sensitive inquiry." Ibid. Applications for continuances or adjournments are reviewed for abuse of discretion. State ex rel. Comm'r of Transp. v. Shalom Money St., LLC, 432 N.J. Super. 1, 7 (App. Div. 2013). In determining whether a request or adjournment should be granted, courts are urged to look at the following factors:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; . . . whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors . . . .
>
> [Hayes, 205 N.J. at 538 (quoting State v. Ferguson, 198 N.J. Super. 395, 402 (App. Div. 1985).]

Certainly, the denial of an adjournment will not lead to a reversal unless the defendant has suffered a manifest wrong or injury.

A-1670-18T1

No abuse of discretion occurred here, nor is a retrial warranted, in light of the above factors. The litigation was ongoing, and Mary knew in advance of Stilwell's proposed testimony because she was served the report months earlier. The judge accepted Stilwell's opinion about the source of the children's behavioral difficulties but did not discount the presence of biological factors. Rather, the judge took Stilwell at her word that the underlying conditions could only be exacerbated by exposure to relentless domestic violence in the home. To have delayed the matter to allow for a belated expert report regarding the children's diagnoses would not have been helpful. The judge did not ignore them. Thus, he did not abuse his discretion by refusing to postpone the matter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1670-18T1