J-S27013-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.H.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M., FATHER | : : : : : : : | |
| | : | No. 459 MDA 2023 |

Appeal from the Decree Entered March 1, 2023
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2022-00743

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED OCTOBER 18, 2023**

J.M. ("Father") appeals from the decree entered on March 1, 2023, in the Court of Common Pleas of Lancaster County Orphans' Court, which granted the petition of J.S. ("Mother") and N.S. ("Stepfather") (collectively the "Petitioners"), for termination of Father's parental rights to his minor daughter, A.H.B. ("Child") (born in August of 2012), pursuant to Sections 2511(a)(1) and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.  After careful review, we affirm.

The orphans' court provided a detailed recitation of the facts and procedural history of this case, which we need not reproduce herein.  ***See*** Orphans' Court Opinion ("OCO"), 4/26/23, at 1-20.  Briefly, Mother and Father were never married.  Mother became pregnant with Child at the age of 15 and ended her relationship with Father shortly thereafter.  Father believed Mother had a miscarriage and was not informed of Child's birth at the time.  Father

met Child for the first time in September of 2020, when she was eight years old. Mother and Father decided to live together and raise Child together as a family. They moved in with Father's friends for the first few months. Father almost immediately became abusive toward both Mother and Child. He stopped working, and Mother provided for them financially. In January of 2021, Mother, Father, and Child moved in with Maternal Grandmother and Step-Grandfather for approximately six weeks. Father did not perform any parental duties for Child. He found Child's behavior to be annoying and gave her CBD gummies to calm her down. Mother and Father then moved into a row house, but Child stayed with Maternal Grandmother because the row house was not suitable for a child and Mother did not believe it was safe for Child to be with Father. Father did not visit Child or provide any financial support for Child while she was living with Maternal Grandmother.

On June 30, 2021, Mother and Father moved out of the row house and into an apartment where Child joined them. During the first night in the new apartment, Mother and Father began arguing and Father threw Mother into a wall and to the ground. He inflicted bruises and cuts on Mother and broke one of Mother's fingers. Child witnessed the altercation. Mother obtained a temporary protection from abuse ("PFA") order against Father. On September 7, 2021, a final PFA order was entered, which remains in effect until September 7, 2024. Child is not a protected party in the PFA order. Mother has not had any contact with Father since the incident on the night of June 30, 2021. Also, since that time, Father has not reached out in any manner to

- 2 -

Child, nor has he paid any child support for her. He has not sent any gifts or cards to Child, has not inquired about her schooling or medical status, and has not attempted to file for custody. Child is afraid of Father.

Shortly after June 30, 2021, Stepfather moved in with Mother and Child and began financially supporting Child. Mother and Stepfather married on February 21, 2022. Stepfather and Child adore each other. On March 22, 2022, Mother and Stepfather filed a petition for adoption and termination of Father's parental rights. The orphans' court appointed a guardian *ad litem* ("GAL") to represent Child's best interests and separate counsel to represent her legal interests. Both the GAL and Child's legal counsel support the termination of Father's parental rights and report that there is no bond between Father and Child. Hearings were held on the termination petition on December 2, 2022, and on January 26, 2023. The orphans' court issued a decree terminating Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1) and (b) on March 1, 2023.

Father filed a timely notice of appeal, as well as a concise statement of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The orphans' court filed a responsive opinion on April 26, 2023. Herein, Father presents the following four issues for our review:

I. Whether the court erred in terminating Father's parental rights to … Child because the Petitioner[s] failed to prove by clear and convincing evidence that Father's parental rights should be terminated under 23 Pa.C.S.[ §] 2511(a)(1).

II. Whether the court erred in terminating Father's parental rights to … Child because the Petitioner[s] failed to prove by

clear and convincing evidence under 23 Pa.C.S.[ §] 2511(b) that it is in … Child's best interest for Father's parental rights to be terminated.

III. Whether the court erred in failing to consider that Father was not told of … Child's existence until she was eight years old and that he did not have scientific proof that he was … Child's biological father until several months after the petition for adoption and termination of parental rights was filed with the court.

IV. Whether the court erred in failing to consider the effect of the [PFA] order on Father's attempts to have contact with … Child.

Father's Brief at 8 (cleaned up).

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

- 4 -

and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

Instantly, we analyze the orphans' court's decision to terminate under Sections 2511(a)(1) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

On appeal, Father essentially avers that the orphans' court erred in concluding that the Petitioners demonstrated, by clear and convincing evidence, that he evidenced a settled purpose of relinquishing his parental claim to Child. Father avers that he was not able to perform any parental duties to Child because of the PFA order that Mother obtained against him. Father's Brief at 15, 18. He claims that he took steps to try to have contact with Child, but that each attempt was thwarted by Mother and Stepfather. *Id.* at 18. Father stresses that he "only had a few months to form a relationship and bond" with Child due to Mother's keeping Child's existence a secret from him for the first seven years of her life, and he accuses the orphans' court of

- 6 -

being "dismissive" of this fact. *Id.* at 19. Additionally, Father states that he could not afford to retain an attorney, that he was not aware of the Self-Help Center at the Lancaster County Courthouse, and that he was under the impression that he needed to wait until the termination proceedings were concluded before filing a custody action. *Id.* at 18.

In reviewing Father's arguments, we have considered the briefs of the parties, the certified record, and the applicable law. We have also assessed the detailed and well-reasoned opinion of the Honorable Jeffrey J. Reich of the Court of Common Pleas of Lancaster County. Judge Reich's opinion thoroughly explains the basis for his conclusion that the Petitioners established, by clear and convincing evidence, that Father's parental rights with respect to Child should be involuntarily terminated pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). *See* OCO at 23-27. Judge Reich points out that Father has not seen Child, nor has he performed any parental duties, since July 1, 2021. *Id.* at 23. Additionally, he opines that during the time that the family was intact, Father performed minimal to no parental duties and failed to provide Child with love, comfort, protection, or support. *Id.* at 24. Notably, Judge Reich recognizes that Father was not aware of Child's existence for many years; however, he emphasizes that when Father was given the opportunity, he "did little, if anything, to nourish a positive bond" with Child. *Id.* at 25-26. *See also id.* at 26 ("Father was largely disinterested in … Child, routinely displayed anger and physical aggression toward Mother within … Child's purview, and on occasion was cruel to … Child."). Judge Reich also addresses Father's

claims regarding the effect that the PFA order had on his relationship with Child. ***See id.*** at 26-27. The record confirms that Judge Reich's decisions regarding both Sections 2511(a) and (b) are supported by ample, competent evidence. Therefore, we adopt his opinion as our own, and we affirm the decree granting the petition to involuntarily terminate Father's parental rights for the reasons set forth therein.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/18/2023

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: : :
A.H.B. : No. 0743 of 2022
: :
: INVOLUNTARY TERMINATION

## OPINION *SUR* APPEAL

This opinion is written in response to an appeal from this court's grant of a Decree which involuntarily terminated the parental rights of **J.M.** as birth father (hereinafter, "Father") of A.H.B. (who is referred to hereinafter as the "Child").

## PROCEDURAL HISTORY OF TERMINATION OF PARENTAL RIGHTS CASE

The Child was born on August 3, 2013. Petitioners **N.S.** (hereinafter, "Stepfather") and **J.B.** n/b/m **J.S.** (hereinafter, "Mother") filed a Petition for Adoption and Termination of Parental Rights on March 22, 2022, by their counsel, James D. Wolman, Esquire. The Respondent, **J.M.** (hereinafter, "Father") was served by a constable with the Petition for Adoption and Termination of Parental Rights on May 11, 2022. By Order dated June 23, 2022, Robert S. Cronin, Jr., Esquire, was appointed legal interest attorney for the Child. By Order dated September 2, 2022, Patricia L. Dunlevy Williams, Esquire, was appointed guardian *ad litem* for the Child at the request of Attorney Cronin. By Order

28

dated September 21, 2022, H. Allison Wright, Esquire, was appointed as counsel to represent Father.

The court held hearings on the termination of parental rights petition on December 2, 2022, and on January 26, 2023. The Decree terminating Father's parental rights was docketed on March 1, 2023. Father timely filed a Notice of Appeal on March 24, 2023.

## FINDINGS OF FACT

1. The Child was born on August 3, 2012. (N.T. 12/2/2022 at page 5)

2. **J.S.** ~~[redacted]~~ is the mother of the Child. (N.T. 12/2/2022 at page 5)

3. Mother is self-employed creating paintings and jewelry and selling them on the internet. (N.T. 12/2/2022 at page 62)

4. **J.M.** ~~[redacted]~~ is the father of the Child. (N.T. 12/2/2022 at page 6)

5. Mother married **N.S.** ~~[redacted]~~ on February 21, 2022. (N.T. 12/2/2022 at page 5)

6. Stepfather is employed as a cook. (N.T. 12/2/2022 at page 63)

7. Stepfather has known Mother since April of 2021. (N.T. 12/2/2022 at page 138)

-2-

8.     Stepfather has supported the Child since he started living with them shortly after June 30, 2021.  (N.T. 12/2/2022 at pages 141 - 142)

9.     The Child has her own bedroom at the apartment of Mother and Stepfather.  (N.T. 12/2/2022 at pages 143-144)

10.    Stepfather and the Child adore each other. (N.T. 12/2/2022 at page 121)

11.    Mother was 15 years of age when the Child was born. (N.T. 12/2/2022 at page 6)

12.    Mother met Father when she was 14 years of age and Father was 18 years of age.  (N.T. 12/2/2022 at page 8 and page 165)

13.    Father impregnated Mother soon after she turned 15 years of age.  (N.T. 12/2/2022 at page 8)

14.    In the fall of 2011, Mother took a pregnancy test and informed Father that it was positive.  (N.T. 12/2/2022 at pages 8 - 9 and pages 50 - 51)

15.    Mother was not happy about having Father's child because Father was abusive to her.  (N.T. 12/2/2022 at page 9)

16.    During the time they were in a relationship before the Child was born, if Mother said something that displeased Father, he would threaten Mother with violence.  (N.T. 12/2/2022 at page 9)

17. During this same time period, Father threatened Mother with a knife because Father thought Mother was cheating on him. Father choked Mother in her sleep because Father didn't like something Mother did while she was sleeping. Father shot a BB gun at the ceiling purposely and kind of ricocheted it and it hit Mother multiple times. Father was also mad that Mother didn't want to talk to him alone after Mother broke up with him and Father took a glass mug full of cigarettes and ashes and threw it in Mother's face. (N.T. 12/2/2022 at page 10)

18. While she was pregnant with the Child in late December 2011 or early January 2012, Mother broke up with Father, moved in with her mother and stepfather in York County, and told her friends that she had miscarried so that, in the event Father were to come and look for her, it would not be to see the child. (N.T. 12/2/2022 at pages 10 and pages 167 - 168)

19. The Child was born at Hershey Medical Center on August 3, 2012. Father was not informed of the birth of the Child. (N.T. 12/2/2022 at pages 10 - 11)

20. Mother continued her schooling and received a high school diploma. (N.T. 12/2/2022 at page 11)

21. For the first seven years of the Child's life, Mother and the Child lived with Maternal Grandmother and Step-Grandfather in York, Pennsylvania. (N.T. 12/2/2022 at pages 11 - 12)

-4-

22. When the Child was seven and a half years old, Mother and the Child moved to Coatesville, Pennsylvania, where they lived with Mother's sister for a little less than a year. (N.T. 12/2/2022 at page 12)

23. In August of 2020, Mother's sister confronted Mother about the Child's father and urged Mother to work on a relationship with him. (N.T. 12/2/2022 at page 12)

24. Mother reached out to Father via social media and informed Father that he had a daughter. Father met the Child for the first time on September 11, 2020. (N.T. 12/2/2022 at page 13 and pages 168 - 169)

25. Father and Mother then decided they would live together and raise the Child together. (N.T. 12/2/2022 at page 171)

26. Subsequently, Mother and the Child moved in with Father, who was staying with friends. This arrangement lasted from September 2020 to July 1, 2021. (N.T. 12/2/2022 at page 13 and page 171)

27. Father's friends were **S.H.** and **C.J.** Their home was located at 217-A North Duke Street, Lancaster, Pennsylvania. (N.T. 12/2/2022 at pages 13 - 14)

28. After living with Father for two weeks, Father's vile behavior became constant, and included his losing his temper, name calling, insults, and verbal abuse directed at Mother and

the Child causing Mother to cry in front of the Child. (N.T. 12/2/2022 at page 14)

29. At this time, Mother worked at Brandywine Hospital in Coatesville, Pennsylvania, and Father was a line cook. (N.T. 12/2/2022 at pages 14 - 15)

30. Father stopped working and Mother had to quit her job due to her being sick with staph meningitis. (N.T. 12/2/2022 at pages 15 - 16)

31. While Mother, Father, and the Child were residing in their friends' home in Lancaster, Pennsylvania, Father performed no parental duties for the Child. (N.T. 12/2/2022 at pages 86 - 87)

32. During this time, Father punished the Child for no reason at all. (N.T. 12/2/2022 at page 89)

33. Mother's friend observed Father give the Child melatonin gummies which caused the Child to pass out. (N.T. 12/2/2022 at page 89)

34. The only activity Father engaged with the Child was playing video games. (N.T. 12/2/2022 at page 90)

35. Mother's friend observed that Father choked Mother to the extent that he left marks on Mother's neck. (N.T. 12/2/2022 at page 91)

36. Father and Mother continued to live with the friends and the Child was enrolled in cyber school. At this time, the

COVID-19 pandemic was underway. (N.T. 12/2/2022 at pages 16 and 86)

37. When Mother was employed, Mother's morning routine was to wake the Child up, get her food, get her dressed, and get her set up for cyber school. By contrast, Father would be laying down, watching television, be on his phone, and playing video games. (N.T. 12/2/2022 at page 17)

38. After Mother stopped working, she used her savings to provide for everything the family needed, including paying rent, purchasing mattresses, and so on. (N.T. 12/2/2022 at pages 17 - 18)

39. Mother, Father, and the Child moved out of their friends' home in January 2021 and went to live with Maternal Grandmother and Step-Grandfather in York, Pennsylvania. Mother, Father and the Child lived at the Maternal Grandparents' home for about five to six weeks. Mother's brother was also living with Maternal Grandmother and Step-Grandfather at that time. (N.T. 12/2/2022 at page 19 and at page 112)

40. During this time, Mother worked at the post office in Lancaster. Father was not working. (N.T. 12/2/2022 at page 20)

41. The Child continued with cyber school while living with the Maternal Grandparents. (N.T. 12/2/2022 at page 21)

42. While Mother was at work, Maternal Grandparents and Mother's brother took care of the Child. (N.T. 12/2/2022 at page 21)

43. The Child was very active, playful, and loved people. Father found the Child's behavior to be annoying and he gave her adult-strength CBD gummies to calm her down. (N.T. 12/2/2022 at page 22)

44. Father believes the Child has Attention Deficit Hyperactivity Disorder. (N.T. 1/26/2023 at page 34)

45. When Father was a teenager, he lived for five years with a woman who had young children. Based upon the knowledge that Father gleaned during this time, Father believes that he has a sufficient basis to parent a young girl. (N.T. 1/26/2023 at pages 35 - 36)

46. Father looked into the use of adult-strength CBD gummies and decided it was appropriate to give them to the Child. (N.T. 1/26/2023 at pages 35 - 36)

47. Mother did not approve of Father giving the Child the CBD gummies, but when she tried to discuss the issue with Father, he would start a fight. (N.T. 12/2/2022 at page 22)

48. Father pressured Mother to give the Child the CBD gummies. (N.T. 1/26/2023 at page 74)

49. Mother felt she was in a hopeless situation where she was unable to prevent Father from giving CBD gummies to the Child. (N.T. 12/2/2022 at page 61)

50. Maternal Grandmother knew Father gave the Child CBD gummies. Father claimed that the Child needed to calm down and stop being rambunctious. Maternal Grandmother's assessment was that the Child was simply being a child displaying normal energy levels. (N.T. 12/2/2022 at page 109)

51. The CBD gummies caused the Child to be in a zombie-like state which would last 3 to 4 hours. (N.T. 12/2/2022 at page 23)

52. When the family lived with the Maternal Grandparents, if the Child was hungry all she could have was cereal. Father would not wake up to tend to her needs. (N.T. 12/2/2022 at page 104)

53. Father performed no parental duties for the Child when the family was living with the Maternal Grandparents. (N.T. 12/2/2022 at pages 105-106)

54. Mother performed all parental duties for the Child except while she was away at work. (N.T. 12/2/2022 at page 110)

55. Maternal Grandmother heard the Child exclaim that she hates her life and that Father is mean to her. Immediately afterward, Father claimed the Child had thrown her laptop computer. However, the laptop computer had simply fallen on the floor. (N.T. 12/2/2022 at pages 110 - 111)

56. Maternal Grandmother observed that Mother, Father, and the Child never appeared to be a happy family. (N.T. 12/2/2022 at page 112)

57. Maternal Grandmother confronted Father about not following the house rules, but he just ignored her. (N.T. 12/2/2022 at page 114)

58. Mother, Father, and the Child had to leave the Maternal Grandparents' home because restrictions in the Maternal Grandparents' housing development excluded persons with a criminal record from residing there and Father had such a record. (N.T. 12/2/2022 at page 25)

59. Mother was able to find a row house for them to move to located at 430 South Queen Street, Lancaster, Pennsylvania. Mother and Father moved to that location in February 2021. (N.T. 12/2/2022 at pages 25 - 27)

60. The Child did not move with Mother and Father to the row house because Mother believed it was not safe for the Child to be with Father. Mother told Father that the row house was not suitable for the Child because the Child has asthma and the place smelled like cigarettes; in addition, there were roaches and mice in the row house. (N.T. 12/2/2022 at pages 26 - 27)

61. Despite these conditions, Father thought nothing was wrong with the row house. (N.T. 12/2/2022 at page 27)

62. Mother and Father lived at the row house until June 2021. Mother missed the Child very much. Mother visited the Child often and talked to her on the telephone every day. (N.T. 12/2/2022 at page 28)

63. Father did not work during this time. Mother paid all of their household expenses. (N.T. 12/2/2022 at page 28)

64. Mother did not have enough income to give Maternal Grandparents money for the support of the Child. (N.T. 12/2/2022 at page 30)

65. Father never asked Mother to drive him to York to see the Child. (N.T. 12/2/2022 at page 31)

66. Father never contributed money for the support of the Child while the Child was living with the Maternal Grandparents. (N.T. 12/2/2022 at page 31)

67. On June 30, 2021, Mother and Father moved out of the row house. Mother did not like the neighborhood. The relationship between Mother and Father was strained. Father was not happy they were moving. (N.T. 12/2/2022 at pages 31-32)

68. Mother's family helped Mother and Father move to an apartment on Michelle Drive in Lancaster, Pennsylvania, where the Child would be able to join them. Father did nothing to assist with the move. (N.T. 12/2/2022 at page 32 and page 116)

69. During the first night they were in the new apartment, Mother was happy to be living in a much nicer place than the row

house.  Father complained about Mother's family members still being there after they did all the moving in extremely hot weather.  (N.T. 12/2/2022 at page 34 and page 116)

70.  Mother tried to comfort the Child because she was nervous about being around Father.  Father asked Mother for a cigarette lighter, which Mother gave to him.  Father and Mother started arguing and Mother tried to get Father to lower his voice.  Father then threw Mother into a wall.  (N.T. 12/2/2022 at page 35)

71.  Mother called the police.  Father then threw Mother to the ground and left.  (N.T. 12/2/2022 at page 36)

72.  Father inflicted bruises and cuts on Mother.  Father broke one of Mother's fingers.  (N.T. 12/2/2022 at page 36)

73.  Father was gone by the time the police arrived.  (N.T. 12/2/2022 at page 36)

74.  The Child witnessed the altercation between Mother and Father.  (N.T. 12/2/2022 at page 192)

75.  Stepfather had to break up the altercation between Mother and Father.  (N.T. 12/2/2022 at page 140)

76.  At the time of the altercation, the Child sent a text message to Maternal Grandmother that said "Please come back, daddy hit mommy." (N.T. 12/2/2022 at page 118)

77.  Later that same night, the Child sent another text message to Maternal Grandmother that said "I don't want to be

here. Please get me out of here. Daddy's bad." (N.T. 12/2/2022 at page 118)

78. When the Maternal Grandparents arrived at the apartment, Mother, Stepfather and the Child were apparently traumatized. Father was gone. (N.T. 12/2/2022 at page 119)

79. The next morning, Father appeared at the apartment screaming. Mother refused to open the door. Father threw rocks and a lighter at her window. (N.T. 12/2/2022 at pages 36 - 37)

80. Mother called the police again but Father was gone by the time they arrived. (N.T. 12/2/2022 at page 37)

81. Mother next obtained a temporary protection from abuse Order against Father. The order was vacated because Mother failed to appear for the hearing. (N.T. 12/2/2022 at pages 37 - 38)

82. Mother filed a second petition for protection from abuse. After a hearing held in Father's absence (after he had been served with notice of the hearing) Mother obtained a final order on September 7, 2021. The final protection from abuse order remains in effect and will expire on September 7, 2024. (N.T. 12/2/2022 at pages 39 - 40, Petitioner's Exhibit 2)

83. Father did not appear for either protection from abuse hearing. Father claims that his "derealization disorder" prevented him from appearing. (N.T. 1/26/2023 at page 32)

-13-

84.  The Child is not a protected party in the final protection from abuse order.

85.  Father has not appeared at Mother's residence since the final protection from abuse order has been in effect.  (N.T. 12/2/2022 at page 152)

86.  Mother has had no contact with Father since June 30, 2021.  Since that date, Father did not reach out in any manner to ask to see the Child nor did he pay any child support for her. (N.T. 12/2/2022 at page 40)

87.  Stepfather and Mother filed their petition for adoption and termination of parental rights on March 22, 2022. (N.T. 12/2/2022 at page 43)

88.  Father has not seen the Child since on or about June 30, 2021.  (N.T. 12/2/2022 at page 48; 1/26/23 at page 8)

89.  Father claimed he had no way to contact Mother.  (N.T. 12/2/2022 at page 168)

90.  Father believes that if he tried to see the Child, the police would be called due to the protection from abuse order in effect against him.  (N.T. 12/2/2022 at page 196)

91.  Father claims he tried to contact Maternal Grandmother on July 23, 2021, in attempt to see the Child but that he received no response.  (N.T. 1/26/2023 at pages 4 - 5)

-14-

92. Father claims that he attempted to contact Stepfather in July 2021, December 2021, and January 2022, with no success. (N.T. 1/26/2023 at pages 5 - 6)

93. Father claims that he sent Stepfather a message via Facebook Messenger to inquire about who was representing Mother in order to make arrangements to see the Child. (N.T. 12/2/2022 at pages 147 - 150)

94. Stepfather stated that he could not receive a message via Facebook Messenger from Father because his account is set up to block messages from any person who is not Stepfather's Facebook friend and Father was not Stepfather's Facebook friend. (N.T. 12/2/2022 at page 150)

95. Father contacted Mother's sister in an attempt to talk to Mother's attorney. (N.T. 12/2/2022 at pages 65 - 66)

96. Father signed an acknowledgment of paternity with regard to the Child on two occasions. On one occasion, Father signed the acknowledgment form on October 2, 2021. Father mailed the form with his signature (but without Mother's signature) to the Pennsylvania Department of Human Services. (N.T. 12/2/2022 at pages 196 - 199; Respondent's Exhibit 3)

97. Father thought it was necessary for him to complete the acknowledgment of paternity form before he would be able to file a child custody action in respect to the Child. (N.T. 12/2/2022 at page 198)

98. Father filed a reverse paternity action through the Lancaster County Domestic Relations Office. At the hearing (which occurred during the summer of 2022), Mother acknowledged that Father is the biological father of the Child, but Father wanted DNA testing. (N.T. 12/2/2022 at page 43)

99. The DNA test, the report of which was received in the Domestic Relations Office on June 21, 2022, proved that Father is the biological father of the Child. (N.T. 12/2/2022 at pages 201 - 202; Respondent's Exhibit 4)

100. Father was aware in January 2021 of the court self help center in the courthouse and that he had the ability to file a custody complaint against Mother without the assistance of an attorney, but Father did not do so. (N.T. 12/2/2022 at page 199; N.T. 1/26/2023 at page 33)

101. Father has not held a job since he last worked at a restaurant from July to November 2020. (N.T. 12/2/2022 at page 161)

102. Father quit working because he got sick. (N.T. 12/2/2022 at page 161)

103. Father received pandemic-related unemployment compensation in the amount of $254 per week which later increased to $354 per week during the years 2020 and 2021. Some of the money came in the form of a lump sum payment of accrued compensation. The lump sum was either $14,000.00 or $16,000.00.

-16-

(N.T. 12/2/2022 at pages 162 - 163; N.T. 1/26/2023 at pages 28 - 29)

104. Father saw no reason to seek a job because he had received the lump sum and was receiving ongoing unemployment compensation which was sufficient to cover his needs. (N.T. 1/26/2023 at pages 28 - 29)

105. Father was living with Mother when he received the lump sum payment. (N.T. 12/2/2022 at pages 162 - 163)

106. Father used the unemployment to support Mother and the Child, including depositing $4,000.00 of the $14,000.00 into the bank account which was jointly titled to Father and Mother. (N.T. 12/2/2022 at page 164)

107. Father believes that being a father to the Child put him in a tough position because of his not being around the Child for eight years. (N.T. 1/26/2023 at page 8)

108. Father has not had a driver's license since 2017. (N.T. 1/26/2023 at page 14)

109. Father was convicted of Driving Under the Influence of Alcohol in 2019. (N.T. 1/26/2023 at page 15; Petitioner's Exhibit 5)

110. Father has a conviction from 2019 for simple assault, strangulation, and recklessly endangering another person. (N.T. 1/26/2023 at page 17; Petitioner's Exhibit 6)

111. Father was on probation at the time when Father started to live with Mother. (N.T. 1/26/2023 at page 18)

112. Father was charged with summary harassment for an offense which occurred on June 22, 2022. (N.T. 1/26/2023 at pages 18 - 19; Petitioner's Exhibit 7)

113. Father suffered from derealization disorder which began in January of 2021 but ceased in July or August of 2021. (N.T. 1/26/2023 at pages 20 and 22)

114. Father testified alternatively about the trigger of the derealization disorder. Firstly, Father stated that the condition came about due to compound stress from finding out about a child he did not know he had, moving in with Mother, and the stress of finding a home for them and working. Later, Father testified that the condition started when he was in prison in 2019 for about five months. (N.T. 1/26/2023 at pages 22 and 24)

115. Father was prescribed Xanax and BuSpar for anxiety related to depersonalization and derealization. (N.T. 1/26/2023 at page 25)

116. When living with the Maternal Grandparents, Father stayed in his room due to hostility from Mother's family and admits that he did not parent the Child. (N.T. 1/26/2023 at page 28)

117. Father ceased sending money to Mother after they separated on July 1, 2021. (N.T. 1/26/2023 at page 30)

-18-

118. Father claims that since separation from Mother he has attempted to give the Child gifts and cards. There is no corroboration for Father's assertions. (N.T. 1/26/2023 at page 38)

119. Since Father's separation from Mother, Father has not inquired about the Child's progress in school. (N.T. 1/26/2023 at pages 39 - 40)

120. Father resides with his mother, Tina Mann ("Paternal Grandmother"). (N.T. 12/2/2022 at page 160)

121. The last time Paternal Grandmother saw the Child was in January or February of 2021. (N.T. 1/26/2023 at page 47)

122. Paternal Grandmother had the Child occasionally for sleep-overs, (N.T. 1/26/2023 at pages 47 - 48)

123. Paternal Grandmother indicated she bought Christmas and birthday gifts for the Child. (N.T. 1/26/2023 at page 49)

124. Paternal Grandmother testified that on August 4, 2021, she had a stack of gifts for the Child and that she went to Mother's residence with the gifts but was told she would be arrested if she tried to see the Child. (N.T. 1/26/2023 at page 51)

125. Mother stopped the Child's sleep-overs at Paternal Grandmother's home because of the presence of cocaine in the home. (N.T. 1/26/2023 at page 75)

126. The Child has a belief that God is important to her and Father has made fun of her for having such a belief. (N.T. 12/2/2022 at page 47)

127. Since Father last saw the Child at the end of June 2021, he has not sent any gifts or letters for the Child, inquired about her schooling or medical status, has not sent birthday cards, and has not attempted to file for child custody. (N.T. 12/2/2022 at page 67)

128. The Child is afraid of Father. (N.T. 12/2/2022 at page 115)

129. The Child states that she hates Father. (N.T. 12/2/2022 at page 121)

130. The Child is glad that Father is not in her life since the incident that triggered the protection from abuse action of June 30, 2021. (N.T. 12/2/2022 at page 145)

131. The Child's legal interest attorney contends on the Child's behalf that Father's parental rights should be terminated. (N.T. 1/26/2023 at pages 83 - 84)

132. The Guardian *ad litem* supports the termination of Father's parental rights and indicated there is no bond between Father and Child. (N.T. 1/26/2023 at pages 84 - 86)

## CONCLUSIONS OF LAW

1. The Petitioners proved by clear and convincing evidence that:

-20-

(a)   Father, by conduct continuing for more than a period of six months preceding the filing of the petition, either has evidenced a settled purpose of relinquishing parental claim to the Child or has refused or failed to perform parental duties. [23 Pa.C.S.A. § 2511 (a)(1)]

2.   The Petitioners proved by clear and convincing evidence that termination of Father's parental rights will best serve the developmental, physical, and emotional needs and welfare of the Child because the Child is in need of a nurturing, loving and a stable home environment, which Father has failed to provide, and the severance of the bond between the Child and Father will have little impact upon the Child. [23 Pa.C.S.A. § 2511 (b)]

## DISCUSSION

In termination of parental rights cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid.   *In re S.H.*, 879 A.2d 802, 806 (Pa.Super. 2005)

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."   *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)

In matters involving involuntary termination of parental rights, the appellate standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the

-21-

trial court if they are supported by the record." *In re Adoption of S.P.,* [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* At [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See in re R.J.T.,* [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)]. *In re T.S.M.,* 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.,* 855 A.2d 68, 73-74 (Pa.Super. 2004)(citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003)(citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa. C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the

-22-

nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007)(citations omitted).

## A.     Termination pursuant to 23 Pa. C.S.A. § 2511(a)(1)

There are two approaches to a finding of grounds for termination of parental rights under this subsection of the statute.   Both require the court to examine the period of at least six months prior to the filing of the petition.   If, during that period of time, a parent exhibits (1) a settled purpose or intent to relinquish a parental claim OR (2) a failure to perform parental duties, the court may then conclude that grounds to terminate exist.

In this case, the subject petition was filed on March 22, 2022.   Six months prior to that date would be September 22, 2021. The evidence is undisputed that Father has not seen the Child nor performed any parental duties since July 1, 2021.

Our appellate courts have instructed us to not mechanically apply the six-month period preceding the filing of the petition, but to consider the entire history of the case.   In following this precept, it is evident that Father has not performed any parental duties as the Superior Court has defined them for well beyond the six-months time period.

As the Superior Court has explained: "There is no simple or easy definition of parental duties.   Parental duty is best

-23-

understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of a child. Thus, this court has held that the parental obligation is a positive duty, which requires affirmative performance...Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life." In re B., N.M., 856 A.2d 847, 855 (Pa.Super. 2004)

The family (consisting of Mother, Father, and the Child) was intact from approximately September 11, 2020, until July 1, 2021. If Father performed any parental duties during that time, his performance was minimal in nature. He did not provide the Child with love, comfort, protection, or support. Father's focus on his needs was far more important to him than providing for the Child's physical and emotional needs. The Child was hungry while under Father's supervision. Father drugged the Child so that she would settle down and not annoy him. Father exhibited aggression toward the Child and belittled her, as demonstrated during the incident where the Child dropped the laptop computer. Father's focus on his own various disorders overrode any concerns he might have had regarding the welfare of the Child. Father failed to provide love and comfort to the Child while the family was intact. In addition, the record establishes that Father tends to

-24-

be abusive toward the Child as he was toward Mother.  Father never demonstrated any reasonable firmness in attempting to see the Child after the family separated.  Father knew he could pursue a child custody action with minimal expense and effort.

In summary, grounds for the termination of Father's parental rights under § 2511 (a)(1) have been proven by clear and convincing evidence.

B.    Needs and welfare of the child pursuant to 23 Pa. C.S.A. § 2511 (b)

The court must next determine whether terminating Father's parental rights to the Child will best serve the developmental, physical, and emotional needs and welfare of the Child.  See, 23 Pa. C.S.A. § 2511 (b).  "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child."  In re C.M.S., 884 A.2d 1284, 1287 (Pa.Super. 2005) An examination of the parent-child bond is required, where the court must assess the effect upon the child of severing that bond.  Expert testimony is not required.  See In re K.K.R.-S., 958 A.2d 529, 533 (Pa.Super. 2008)

There are unusual circumstances in the present case, in that Father was not aware of the Child's existence for many years.  However, Mother, at the urging of her sister, sought to re-establish a relationship with Father and to make a family with him and the Child.  During the time period that the family was

-25-

intact and the opportunity to build positive relationships was present, Father did little, if anything, to nourish a positive bond between the Child and him. Father was largely disinterested in the Child, routinely displayed anger and physical aggression toward Mother within the Child's purview, and on occasion was cruel to the Child.

Father complains that the court erred in not considering that Father was unaware of the Child's existence until she was eight years of age and he did not have genetic proof he was the biological father until several months after the petition for termination was filed.

The court cannot condone Mother's act of not informing Father of the birth of the Child for a period of seven years even though there was a significant history of abusive behavior by Father. The compelling fact remains that when Father was given the chance to be a parent to the Child, he failed. He did not behave as an interested, engaged parent; he did little, if anything, to provide the Child with love, comfort, and security.

Father complains that the court erred in not considering the effect that the active protection from abuse order had on Father's attempts to see the Child. The protection from abuse order was a roadblock that Father had to overcome in order to have access to the Child but Father failed to demonstrate reasonable firmness, or for that matter, any firmness in

overcoming this roadblock. Father knew he could have brought a child custody action but he did not take that minimal step to protect his relationship with the Child.

The Child deserves a nurturing, loving, and stable home. The Child presently enjoys a home possessing these characteristics with Mother and Stepfather. The Child's needs are met and her welfare is being promoted in her present home. Father's on-going presence in the Child's life would only disturb the peace the Child now enjoys.

## CONCLUSION

The issues raised by Father in his Notice of Appeal lack merit and the Decree entered March 1, 2023, should be affirmed.

**BY THE COURT:**

JEFFREY J. REICH, JUDGE

Dated: April 26, 2023

Attest /s/ Saskia Sayeg
Deputy Clerk of Orphans' Court

-27-